WAREHOUSE ASSOCIATES CORPO-
RATE CENTRE II, INC., Warehouse
Associates Corporate Centre Post
Oak, Ltd., and Warehouse Associates
Development, Inc., Appellants

v.

CELOTEX CORPORATION, Lecil
M. Colburn, and David
Murry, Appellees.

No. 14–03–01444–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

March 30, 2006.

Neil Kenton Alexander, Jr., Houston, for appellants.

John Ellis O'Neill, Sheryl Anne Falk, Houston, for appellees.

Panel consists of Justices FOWLER, FROST, and SEYMORE.

## OPINION

KEM THOMPSON FROST, Justice.

This case arises out of the sale of real property under a contract that contains as-is and waiver-of-reliance provisions. After the sale, the buyer discovered asbestos in the soil on the property and brought suit against the seller and its employees alleging common law fraud, statutory fraud, and negligent misrepresentation. The main issue on appeal is whether the trial court correctly granted summary judgment based on the contract's as-is and waiver-of-reliance provisions. We first discuss the effect of the Texas Supreme Court's decision in *Schlumberger Tech. Corp. v. Swanson* on its prior opinion in *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.* We then conclude that the trial court erred in granting summary judgment as to the fraudulent-inducement exception to the enforceability of the as-is and waiver-of-reliance provisions because the summary-judgment evidence raises a fact issue as to whether the seller's alleged fraudulent representations or concealment of information induced the buyer to enter into this contract. However, we also conclude that the summary-judgment evidence proves as a matter of law that the seller did not impair, obstruct, or interfere with the buyer's inspection of the property, which, if proved, would have defeated enforceability of the as-is and waiver-of-reliance provisions in the sales contract. Because there is a fact issue as to the fraudulent-inducement exception, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This dispute between sophisticated parties involves approximately twelve acres of land at 1400 North Post Oak Road in Houston, Texas (the "Property"). Appel-

lee Celotex Corporation operated an asphalt shingle manufacturing plant on the Property for a number of years until 1998, when Celotex permanently closed the plant. Celotex decided to sell the Property and retained Cushman & Wakefield as its real-estate broker. While Cushman & Wakefield was entertaining bids for the Property, Warehouse Associates[1] asked Cushman & Wakefield for any documents that Celotex had regarding the Property. In response, Celotex forwarded part of a 1996 environmental report prepared for Celotex. The part of this report Celotex produced indicates that there had been asbestos issues relating to the buildings on the Property but indicates nothing about asbestos contamination in the soil or use of asbestos in the manufacturing process on the Property, as opposed to asbestos in building materials in the structures on the Property. Celotex did not give Warehouse Associates the part of the report stating that asbestos previously had been used in the manufacturing process at the plant on the Property.

### Contract for the Sale of the Property

After receiving various offers and inquiries, on January 24, 2000, Celotex entered into a written contract with appellant Warehouse Associates Development, Inc. for the sale of the Property (the "Contract"). The Contract provided for a purchase price of $3.25 per square foot, or a total of approximately $1.7 million. The Contract recited that Celotex had begun demolition of all existing structures on the Property down to the slab level and that Celotex would use its best efforts to cause such demolition work to be completed as soon as possible. Celotex agreed to send a notice to Warehouse Associates upon completion of this demolition work. Under the Contract, Warehouse Associates was allowed to inspect the Property within sixty days from the date Celotex gave notice that it had completed this demolition work. During this sixty-day inspection period, Warehouse Associates had the right to terminate the Contract by written notice if its inspections revealed conditions unsatisfactory to it in its sole discretion.

### Seller's Disclaimer of Warranties, Promises, Covenants, and Guaranties

In the Contract, the parties agreed that, other than the warranties of title contained in the deed, Celotex did not make and was specifically disclaiming any representations, warranties, promises, covenants, or guaranties of any kind. The Contract imposed no obligation on Celotex to provide documents or records relating to the Property's condition. Warehouse Associates, however, was entitled to conduct inspections, tests, and investigations as it deemed necessary to determine the suitability of the Property for its intended use. Unless Warehouse Associates terminated the Contract before the inspection period expired, Warehouse Associates would be obligated to close the transaction, and, upon closing, Warehouse Associates would assume all existing and future liabilities associated with the ownership, use, and possession of the Property, including any

---

1. Most of the summary-judgment evidence does not distinguish between the three appellants, all of which have "Warehouse Associates" in their names. Warehouse Associates Development, Inc. is a party to the contract for sale of the Property. Warehouse Associates Corporate Centre Post Oak, Ltd. is the grantee in the deed from Celotex. Because the distinctions among the corporate entities are not relevant to the issues on appeal, for convenience, we refer to the appellants collectively as "Warehouse Associates," unless otherwise specified. Even though we refer to three entities, we use the singular noun, "Warehouse Associates."

liabilities imposed by local, state, or federal environmental laws or regulations.

### Buyer's Right to Inspect and Waiver of Reliance

In the Contract, Warehouse Associates, as the buyer, acknowledged that it had the opportunity to inspect the Property and agreed that it was relying solely on its own inspection and investigation of the Property and not on any information from Celotex. The parties also agreed that the sale of the Property at closing would be on an "as is, where is" condition and basis "with all faults." On February 10, 2000, Celotex gave notice that it had completed demolition of the buildings down to the slabs, triggering the buyer's sixty-day inspection period that ended on April 10, 2000.

### Occurrences After Commencement of Inspection Period

On the day that the inspection period began, Celotex's contractor was excavating soil on the Property and found what appeared to the contractor to be raw, friable asbestos buried in the ground. The contractor contacted appellee Lecil M. Colburn, Celotex's Director of Environmental Affairs and chairman of a Celotex committee formed to sell various Celotex properties. The contractor asked Colburn what to do and Colburn instructed the contractor to leave that area of the Property alone and to backfill the excavated area, indicating the matter would be addressed at a later date. The contractor had one employee, wearing a respirator, backfill the excavation as quickly as possible.

During the relevant period, HBC Engineering, Inc. ("HBC") inspected the Property and conducted a Phase I Environmental Site Assessment of the Property. HBC had discussions about the Property with Colburn and with David Murry, a shipping supervisor for Celotex. HBC did not specifically ask Colburn about asbestos, and Colburn said nothing to HBC about asbestos or the recent discovery of suspected asbestos-containing material buried in the ground on the Property. Colburn listed the major raw materials Celotex had used in its shingle-manufacturing process without mentioning asbestos. He also stated his belief that Celotex's predecessor had used a similar shingle-manufacturing process. At the end of his interview with Colburn, an HBC representative asked Colburn if he was aware of any other environmental concerns, and Colburn said nothing about the suspected asbestos-containing material recently discovered on the Property or about the possibility of asbestos being buried in the soil on the Property. HBC also conducted an environmental site investigation that included analysis of soil and groundwater samples taken from the Property. HBC did not test the soil for the presence of asbestos. In its reports to the buyer, HBC did not mention anything about any contamination of the soil on the Property due to asbestos.

### Buyer's Discovery After the Sale

Warehouse Associates did not exercise its right to terminate the Contract during the inspection period. On May 24, 2000, the sale closed and Celotex conveyed title to the Property to appellant Warehouse Associates Corporate Centre Post Oak, Ltd. by a special warranty deed that contains the same waiver-of-reliance and as-is language as the Contract. In August 2000, a contractor demolishing the concrete slabs discovered asbestos-containing material in the soil on the Property. An expert analyzed soil borings and detected more than one percent asbestos in forty-four of seventy soil borings from sites across the Property. This expert concluded that the Property has extensive, widespread asbestos-containing material in the

soil to a depth of at least thirteen feet below the ground surface.

## Claims and Counterclaims

Appellants Warehouse Associates Corporate Centre II, Inc., Warehouse Associates Corporate Centre Post Oak, Ltd., and Warehouse Associates Development, Inc. (collectively referred to herein as "Warehouse Associates") filed claims against appellees Celotex, Colburn, and Murry (the "Celotex Parties"), alleging damage claims for common law fraud, negligent misrepresentation, and statutory fraud under section 27.01 of the Texas Business and Commerce Code. Warehouse Associates also sought the equitable remedy of rescission of the transaction, as well as punitive damages and attorney's fees. The Celotex Parties counterclaimed against Warehouse Associates asserting various claims.

## Motions for Summary Judgment

Warehouse Associates filed a motion for summary judgment seeking dismissal of the Celotex Parties' counterclaims. The Celotex Parties filed a seventy-page traditional motion for summary judgment, as well as more than 1,700 pages of summary-judgment evidence. In their motion, the Celotex Parties asserted the following independent grounds in support of a take-nothing judgment in their favor:

(1) As a matter of law, Warehouse Associates may not assert it relied upon the Celotex Parties' representations because Warehouse Associates conducted its own independent investigation of the environmental condition of the Property and the Celotex Parties did not interfere with this investigation in any manner.

(2) The waiver-of-reliance and as-is language in the Contract and the deed negate the essential element of reliance as a matter of law.

(3) Warehouse Associates's claims are barred by the doctrines of estoppel by contract and estoppel by deed.

The trial court granted a take-nothing summary judgment in favor of the Celotex Parties as to all of Warehouse Associates's claims.[2] The trial court also granted Warehouse Associates's motion for summary judgment and dismissed all of the Celotex Parties' counterclaims, except the counterclaim seeking attorney's fees, expenses, and costs under a provision in the Contract allowing such recovery to the prevailing parties in any claim or controversy relating to the Contract.[3] Subsequently, the trial court granted summary judgment in favor of the Celotex Parties on this counterclaim, awarding them more than $2,000,000 in attorney's fees, expenses, and costs. The trial court signed a

2. The Celotex Parties also sought a partial summary judgment requiring Warehouse Associates to accept Celotex's tender to buy back the Property for the amount paid by Warehouse Associates plus interest, without prejudice to the pending claims in this case and without admitting that the Celotex Parties engaged in any actionable conduct. The trial court denied the Celotex Parties' motion for summary judgment in this regard, and the Celotex Parties have not appealed this ruling.

3. A deputy district clerk apparently faxed the orders reflecting these rulings to counsel along with a fax cover sheet describing the trial court's rulings. The fax cover sheet was signed by the clerk but not signed by the trial court. On appeal, the Celotex Parties assert that this fax cover sheet conveys the trial court's summary-judgment rulings. We disagree. A letter is not the proper method for apprising the parties of summary-judgment rulings. *Shannon v. Tex. Gen. Indem. Co.,* 889 S.W.2d 662, 664 (Tex.App.-Houston [14th Dist.] 1994, no writ). Therefore, we do not consider the fax cover sheet and instead base our review on the trial court's summary-judgment orders and final judgment.

final judgment setting out all of its summary-judgment rulings.

Although Warehouse Associates has appealed the dismissal of its claims, the Celotex Parties have not appealed the trial court's dismissal of their counterclaims or the trial court's denial of their request for summary judgment compelling Warehouse Associates to accept Celotex's tender to buy back the Property.

## II. ISSUES PRESENTED

Warehouse Associates presents the following issues for appellate review:

(1) Is a seller of real property who (a) knowingly conceals and intentionally fails to disclose environmental hazards to a buyer and (b) interferes with the buyer's investigation of the property nevertheless immunized from fraud and misrepresentation claims because the sales contract and warranty deed contain an "as is—no reliance" clause?

(2) Is a seller of real property who (a) actively conceals or purposefully fails to disclose material information about the environmental condition of the property or (b) provides misleading information to the buyer immunized from fraud and misrepresentation claims because the buyer undertook investigation of the Property?

(3) Does the doctrine of estoppel by contract or deed apply to a fraudulently induced contract or deed?

(4) May a buyer recover lost profits when a seller has fraudulently induced the sale of commercial property?

## III. STANDARD OF REVIEW

In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor. *Dolcefino v. Randolph,* 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.* Because the trial court did not specify the grounds upon which it granted a take-nothing summary judgment in favor of the Celotex Parties, Warehouse Associates must show that each independent ground alleged in the motion for summary judgment is insufficient to support the judgment granted. *See Caldwell v. Curioni,* 125 S.W.3d 784, 789 (Tex.App.-Dallas 2004, pet. denied).

## IV. ANALYSIS

**A. To what extent, if any, did *Schlumberger Technology Corp. v. Swanson* change the legal standard used in *Prudential Insurance Co. of America v. Jefferson Associates, Ltd.* to determine whether the as-is and waiver-of-reliance language defeats the buyer's fraud claims as a matter of law?**

In *Prudential Insurance Co. of America v. Jefferson Associates, Ltd.,* the Texas Supreme Court limited the enforceability of as-is and waiver-of-reliance language to exclude situations in which (1) the buyer was induced to enter into the contract containing that language by a fraudulent representation or concealment of information by the seller or (2) the seller engaged in conduct that impaired, obstructed, or interfered with the buyer's inspection of the property being sold.[4] *See* 896 S.W.2d

---

**4.** The *Prudential* court also recognized that other aspects of a transaction may make as-is or waiver-of-reliance language unenforceable. *See Prudential Ins. Co.,* 896 S.W.2d at 162.

156, 160–62 (Tex.1995). In this opinion, we refer to these exceptions as the "fraudulent-inducement exception" and the "impairment-of-inspection exception," respectively. Before determining if the summary-judgment evidence raises fact issues as to these *Prudential* exceptions," we address the Celotex Parties' argument under *Schlumberger Technology Corp. v. Swanson* that the as-is and waiver-of-reliance language in the Contract is enforceable even if such fact issues exist. 959 S.W.2d 171 (Tex.1997). After carefully reviewing *Schlumberger,* we are compelled by the Texas Supreme Court's analysis in that case to disagree with this argument. The *Schlumberger* court's analysis leads us to conclude that the two *Prudential* exceptions still stand, subject to a small exception to the fraudulent-inducement exception carved out by *Schlumberger,* which does not apply in the instant case.

In *Schlumberger,* Schlumberger Technology Corporation wanted to buy the Swansons' interest in an underwater diamond mining operation. *See id.* at 173–74. After becoming embroiled in a dispute with Schlumberger over their interest's value, the Swansons agreed to a price and sold their interest to Schlumberger. *See id.* at 174. As part of this sale, the Swansons executed a release specifically noting the dispute as to the interest's value, providing for a release of all of the Swansons' claims regarding this interest, and containing a waiver-of-reliance provision. *See id.* at 180. The Swansons later sued Schlumberger, asserting that Schlumberger

fraudulently induced them to enter into this transaction. *See id.* at 174.

In discussing the enforceability of the waiver-of-reliance provision, the Texas Supreme Court began with a presumption that, as found by the jury, Schlumberger had fraudulently induced the Swansons to enter into the transaction and sign the release. *See id.* at 174, 178. The Texas Supreme Court rejected Schlumberger's argument that, as long as the releasing party was represented by counsel in an arms-length transaction, a waiver-of-reliance provision in a release bars a claim that the releasing party was fraudulently induced to sign the release. *See id.* at 175, 178. The *Schlumberger* court observed that some Texas Supreme Court precedents hold that a release can be set aside upon proof of fraudulent inducement, even if the release contains a waiver-of reliance provision. *See id.* at 178. However, the *Schlumberger* court also acknowledged that other cases reached the opposite result. *See id.* at 178–79. The Texas Supreme Court then stated that it resolved these two conflicting lines of authority in *Dallas Farm Machinery Co. v. Reaves,* a case decided four decades earlier, in which it adhered to the former line of cases that refuse to enforce fraudulently induced waiver-of-reliance provisions. *See id.* at 179 (discussing *Dallas Farm Machinery Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233 (1957)). The *Schlumberger* court observed that the holding in *Dallas Farm Machinery* brought Texas law into harmony with

The *Prudential* court indicated that, even absent fraudulent inducement or impairment of inspection, such language still may not be enforceable based on consideration of the totality of the circumstances, including such factors as (1) the sophistication of the parties and whether they were represented by counsel, (2) whether the contract was an arm's length transaction, (3) the relative bargaining power of the parties and whether the contrac-

tual language was freely negotiated, and (4) whether that language was an important part of the parties' bargain, not simply added in a "boilerplate" provision. *See id.* Although this possible basis for invalidating the Contract's language is not at issue in this appeal, we note that the two *Prudential* exceptions at issue in this case are not the only potential grounds for invalidating such language. *See id.*

the great weight of authority, the Restatement of Contracts, and the views of eminent legal scholars. *See id.*

After seeming to embrace *Dallas Farm Machinery Co.,* the *Schlumberger* court then stated that juxtaposed against this authority is a competing concern—the ability of the parties to fully and finally resolve disputes between them. *See id.* Reasoning that parties should be able to bargain for and execute a release barring all further disputes, the *Schlumberger* court opined that circumstances should exist under which a contracting party can clearly and specifically disclaim reliance on misrepresentations of another party so as to defeat a claim of fraudulent inducement as a matter of law. *See id.* The *Schlumberger* court then gave as an example, a disclaimer of reliance conclusively negating the element of reliance, which is essential to a fraudulent inducement claim. To illustrate this example, the *Schlumberger* court cited *Prudential Insurance Co.,* 896 S.W.2d at 161–62, and *Estes v. Hartford Accident & Indemnity Co.,* 46 S.W.2d 413, 417–18 (Tex.Civ.App.-El Paso 1932, writ ref'd). *See id.* Though the *Prudential* case did enforce waiver-of-reliance language in a contract, the part of that opinion cited by the *Schlumberger* court cites *Dallas Farm Machinery Co.* and notes that such language is not enforceable against a buyer induced to enter into the contract by the seller's fraudulent representation or concealment of information. *See Prudential Ins. Co.,* 896 S.W.2d at 161–62. The other Texas Supreme Court precedent cited by the *Schlumberger* court, *Estes v. Hartford Accident & Indemnity Co.,* held that the record contained no evidence of reliance on the alleged fraudulent misrepresentation that allegedly induced a party to sign a release. *See Estes,* 46 S.W.2d at 417–18. However, there is no mention in *Estes* that the release contained a waiver-of-reliance clause,

and the court states that the release would not be enforceable if the releasor had proved fraud upon which he relied in signing the release. *See id.* at 417.

The *Schlumberger* court described the circumstances in which waiver-of-reliance language would negate proof of fraudulent inducement as follows:

> The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding. Because the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance.

*Schlumberger Tech. Corp.,* 959 S.W.2d at 179–80 (citations omitted).

The *Schlumberger* court found it significant that, throughout the negotiations that led to the execution of the release, the parties disagreed about the value of the Swansons' interest. *See id.* at 180. The *Schlumberger* court stated that the sole purpose of the release was to end the dispute as to the value of the commercial project once and for all. *See id.* Noting that the Swansons unequivocally disclaimed reliance upon representations by Schlumberger about the project's value, the *Schlumberger* court concluded that, in light of this language and in this context, the Swansons must have intended to forego reliance on any representations about the value of the project, given that this was the very dispute the release was supposed to resolve. *See id.*

In concluding, the *Schlumberger* court emphasized that a waiver-of-reliance clause will not always bar a fraudulent-inducement claim and noted that the *Prudential* case had identified some circumstances in which an as-is clause would not

preclude a fraudulent-inducement claim. *See id.* (citing *Prudential Ins. Co.*, 896 S.W.2d at 162). Again, the part of *Prudential* cited by the *Schlumberger* court includes a citation to *Dallas Farm Machinery Co.* and states that the buyer would not have been bound by the as-is provision (which contained waiver-of-reliance language) if it had been induced to enter into the contract by the fraudulent representation or concealment of information by the seller. *See id; Prudential Ins. Co. of Am.*, 896 S.W.2d at 162. After indicating that the *Prudential* exceptions are still valid, the *Schlumberger* court stated, "We conclude *only* that *on this record,* the disclaimer of reliance conclusively negates as a matter of law the element of reliance on representations about the feasibility and value of the sea-diamond mining project needed to support the Swansons' claim of fraudulent inducement." *See id.* at 181 (emphasis added).

The *Prudential* court set forth two exceptions to the enforceability of as-is or waiver-of-reliance language in a contract.[5] *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 162. One of these exceptions is inducement of the complaining party to enter into the contract by the fraudulent representation or concealment of information by the party seeking to enforce the contractual language. *See id.* The *Schlumberger* court indicated that both exceptions from *Prudential* are still valid but also held that under the circumstances shown by the record in *Schlumberger,* fraudulent inducement did not prevent enforcement of the waiver-of-reliance language in the release between Schlumberger and the Swansons. *See Schlumberger Tech. Corp.*, 959 S.W.2d at 179–81.

*Schlumberger* allowed a party to enforce a waiver-of-reliance clause even though the court presumed, as found by the jury, that the party in question fraudulently induced the other parties to enter into the contract containing that clause. *See id.* at 175, 178–81. If we were to read *Schlumberger* broadly, this holding likely would be applied in many cases based on such commonly existing factors as (1) an arm's length transaction between sophisticated parties represented by counsel and (2) waiver-of-reliance language that clearly and unequivocally covers the specific representations on which the complaining party allegedly relied. However, the *Schlumberger* court itself stated that an arm's length transaction between parties represented by counsel is not enough to enforce a waiver-of-reliance clause. *See id.* at 175, 178. Furthermore, a broad reading of *Schlumberger* effectively would overrule the *Prudential* fraudulent-inducement exception that *Schlumberger* and many other authorities indicate is still good law. *See Geodyne Energy Income Prod. P'ship I–E v. Newton Corp.*, 161 S.W.3d 482, 487, 490 & n. 32 (Tex.2005) (holding that quitclaim deed containing as-is language did not violate Texas Securities Act but citing the two *Prudential* exceptions and stating that analysis would be different if there were evidence of fraudulent inducement);

---

5. The Celotex Parties argue that *Prudential* applies only to as-is language and not to waiver-of-reliance language. We disagree. Although the *Prudential* court referred to the contract language at issue in that case as an " 'as is' provision," the provision in question contained both waiver-of-reliance and as-is language. *See Prudential Ins. Co.*, 896 S.W.2d at 160–61. Therefore, the *Prudential* exceptions apply to both types of language.

*See id.* at 161–62; *Bynum v. Prudential Residential Servs., Ltd. P'ship*, 129 S.W.3d 781, 787–92 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (applying *Prudential* exceptions to contract containing both waiver-of-reliance and as-is language); *Nelson v. Najm*, 127 S.W.3d 170, 173, 175–76 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (same as *Bynum* ).

*Schlumberger Tech. Corp.*, 959 S.W.2d at 181; *Kane v. Nxcess Motorcars, Inc.*, No. 01–04–00547–CV, 2005 WL 497484, at *6–7 (Tex.App.-Houston [1st Dist.] Mar. 3, 2005, no pet.) (holding in memorandum opinion that trial court erred in granting summary judgment based on as-is clause because of fact issues as to fraudulent-inducement exception under *Prudential*); *Bynum v. Prudential Residential Services, Ltd. P'ship*, 129 S.W.3d 781, 787–92 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (applying *Prudential* exceptions to contract containing both waiver-of-reliance and as-is language and determining that summary-judgment evidence did not raise a fact issue as to these exceptions); *Nelson v. Najm*, 127 S.W.3d 170, 173, 175–76 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) (applying *Prudential* analysis to contract containing both waiver-of-reliance and as-is language and determining that such language did not bar fraud claims because there was evidence that seller fraudulently induced buyer to enter into contract by fraudulent concealment). *Schlumberger* expressly preserves the *Prudential* exceptions while, at the same time, on the facts "in [the *Schlumberger*] record," it forecloses application of the fraudulent-inducement exception from *Prudential.* We must reconcile these two aspects of *Schlumberger* to discern its application in this case.

■ Upon careful consideration of the entire opinion in *Schlumberger*, we conclude that the decisive factor in the case was the contracting parties' mutual intent to definitively resolve a long-running dispute in which they had been embroiled.[6] The *Schlumberger* court held that the fraudulent-inducement exception from *Prudential* does not apply to waiver-of-reliance language (1) that clearly and unequivocally disclaims reliance on the specific representations that are the basis of the claims in question, (2) in a contract whose purpose is to definitively end a dispute in which the contracting parties have been embroiled, (3) in an arm's length transaction between sophisticated parties represented by counsel.[7] *See Schlumberger Tech. Corp.*, 959 S.W.2d at 179–81. Because the Contract's purpose was not to definitively end a dispute in which Celotex and Warehouse Associates had been embroiled, this case does not fall within the scope of *Schlumberger*, and therefore, the two *Prudential* exceptions provide the legal standard.[8]

**B. Is there a genuine issue of material fact as to the two *Prudential* exceptions?**

In their traditional motion for summary judgment, the Celotex Parties asserted

**6.** The *Schlumberger* court left the impairment-of-inspection exception from *Prudential* completely intact. *See Schlumberger Tech. Corp.*, 959 S.W.2d at 181; *Prudential Ins. Co.*, 896 S.W.2d at 162.

**7.** The Celotex Parties present policy arguments for a rule that, regardless of any alleged fraudulent inducement, would enforce freely negotiated as-is and waiver-of-reliance provisions in a deliberately negotiated contract between sophisticated parties, so as to bar fraud claims by a buyer who undertook the obligation to inspect property before the sale and who, after having been given the opportunity to do so, elected to purchase the

property "as is." Regardless of the merits of these policy arguments, the *Prudential* exceptions still apply, based on the opinions in *Schlumberger* and *Prudential.*

**8.** This holding is consistent with *IKON Office Solutions, Inc. v. Eifert*, in which this court held that *Schlumberger* applied to a contract that sought to end a "lengthy and intense dispute." *See* 125 S.W.3d 113, 125–28 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). Furthermore, *IKON Office Solutions* did not cite the *Prudential* exceptions or discuss how *Schlumberger* affects these exceptions. *See id.*

that the following waiver-of-reliance and as-is language in the Contract and the deed negates reliance by Warehouse Associates as a matter of law:

OTHER THAN THE WARRANTIES OF TITLE CONTAINED IN THE DEED, PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY ... (E) THE HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY THAT SELLER HAS NOT MADE, AND DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING SOLID WASTE, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTY, OF ANY HAZARDOUS SUBSTANCE, AS DEFINED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND APPLICABLE STATE LAWS, AND REGULATIONS PROMULGATED THEREUNDER. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY THE SELLER. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY IN FORMATION [sic] PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PROPERTY AT CLOSING SHALL BE MADE ON AN "AS IS, WHERE IS" CONDITION AND BASIS "WITH ALL FAULTS[.]"

(hereinafter the "Contract Language").

Warehouse Associates asserts the summary-judgment evidence raises a genuine issue of material fact as to the two *Prudential* exceptions (fraudulent-inducement and impairment-of-inspection) to the enforceability of this Contract Language. As discussed above, the existence of fact issues as to either one of these *Prudential*

exceptions would preclude summary judgment based on the Contract Language. *See Geodyne Energy Income Prod. P'ship I–E,* 161 S.W.3d at 487, 490 & n. 32; *Schlumberger Tech. Corp.,* 959 S.W.2d at 181; *Prudential Ins. Co. of Am.,* 896 S.W.2d at 162.

### 1. Fraudulent Inducement

■ Warehouse Associates does not complain of fraudulent inducement as to the presence of asbestos in the building materials used in the structures that were demolished and removed by Celotex. Warehouse Associates asserts that the abatement of asbestos in these structures did not cause them concern because it was Celotex's responsibility to remove this asbestos before closing. Warehouse Associates asserts that asbestos in building materials in the structures did not alert it to the presence of asbestos buried in the soil on the Property.

Under the applicable standard of review, the following summary-judgment evidence creates a genuine issue of fact as to whether Celotex actually knew that asbestos was in the soil on the Property:

- An August 14, 1999 Celotex memorandum regarding the status of demolition and environmental activities and costs at the Property based on two meetings with Colburn that states that "[t]he environmental work required relates to 1) Asbestos in the ground...."
- A handwritten document regarding "Site Clean–Up" at the Property appears to project costs of cleaning up "On Site Soils" at $1.5 million and notes, "This is removal of some materials—not total removal of asbestos containing materials."
- An internal Celotex budget shows that, for fiscal year 1999, Celotex budgeted $1.5 million for remediation of the soil on the Property, separate from amounts budgeted for demolition of the structures, remediation of drums and tank contents, removal of a tank farm and remediation of the soil thereunder, and in-building asbestos removal.
- Joe Vela, who worked at the plant on the Property from 1951–91, testified that some Celotex employees, including some of the managers, in the 1980s and 1990s knew that asbestos-containing shingle pieces had been dumped in the ground on the Property and knew that the plant on the Property had manufactured asbestos-containing material.
- In negotiating the contract with its real-estate broker, Cushman & Wakefield, Celotex removed from the draft contract a sentence in which Celotex represented that it had no knowledge of toxic, contaminated, or hazardous substances or conditions except as it had informed Cushman & Wakefield in writing. Celotex replaced this language with a sentence stating that Celotex represents that it will share information relating to the environmental status of its properties.

Under the applicable standard of review, we also conclude that there is a genuine issue of fact as to whether Celotex induced Warehouse Associates to enter into the Contract by alleged fraudulent misrepresentation or concealment of asbestos contamination in the soil on the Property. We reach this conclusion based on the following summary-judgment evidence:

- On October 28, 1999, Celotex's broker sent Warehouse Associates a document that it had received from Celotex—part of a 1996 environmental assessment done for Celotex. In the cover letter that accompanied this document, the broker stated, "as you

will see from this report, there does not appear to be any major environmental issues that would have an adverse effect on the property." The attached document showed that asbestos was present in building materials used in the structures on the Property. However, this assessment did not mention asbestos contamination in the soil on the Property and did not mention that asbestos had ever been used as a raw material in the manufacture of any product on the Property. Celotex did not give Warehouse Associates the part of this assessment stating that, in the past, asbestos had been used in the manufacturing process to make roofing products on the Property and that the manufacturing process typically generated waste that included "reject shingles." Celotex's broker in this transaction testified that, if Celotex had given him the part of this report that referred to asbestos being used in the manufacturing process on the Property, he would have disclosed it to Warehouse Associates because it pertains to the Property and should have been revealed to Warehouse Associates.

● In response to Warehouse Associates's request for a site map of the Property, instead of producing a detailed 1988 map of the Property that Celotex had in its possession, Cushman & Wakefield made a simpler map based on the 1988 map and produced the new map to Warehouse Associates before Warehouse Associates signed the Contract. The new map omitted many details about the structures and past activities on the Property, including one notation indicating that asbestos siding was manufactured on the Property. Joe Vela used the term "asbestos siding" to refer to asbestos roofing shingles.

● Thomas Martens, Manager of Environmental Services for HBC's Houston office, testified that Murry of Celotex told him on January 6, 2000, that Celotex had manufactured asphaltic roofing shingles on the Property for a number of years (Martens thought he said about twenty or thirty years). Murry stated that the raw materials used in this manufacturing process were a paper-type material, a tar-like asphaltic material, and a granular sand-like material. Murry told Martens that, before Celotex occupied the Property, there was another shingle-manufacturing company that conducted manufacturing operations on the Property and that those operations were similar to those of Celotex. Martens described his conversations with Murry and Colburn to David R. David of Warehouse Associates in "fair detail," including the description of the manufacturing process.

● Colburn testified that, if he were buying a property, he would want to know the history of the plant and also would want to know if asbestos had ever been used in manufacturing in any way in that plant. Colburn also testified that during its ownership of the Property, Celotex had manufactured "asbestos roofing" and that a "mat material" containing asbestos fiber was used in the manufacturing of shingles on the Property at some time in the past.

● David, an authorized representative of Warehouse Associates, testified in his affidavit that (1) Warehouse Associates had no knowledge concerning the presence of asbestos or asbestos-containing materials in the soils on the Property until August 2000; (2) before that time, the only knowledge Warehouse Associates had was of as-

bestos in the structures on the Property; however, under the Contract, those structures and the asbestos-containing materials therein were to be completely removed and remediated before the closing of the sale; (3) at no time before August 2000, was Warehouse Associates aware of asbestos contamination in the soil on the Property.

● Martens of HBC testified that asbestos-containing materials are often found in buildings but that the presence of asbestos-containing materials in buildings does not raise a suspicion that asbestos is in the soil.

The Celotex Parties assert that Warehouse Associates knew about the use and presence of asbestos on the Property before closing. However, knowledge of the presence of asbestos-containing materials in the structures to be removed by Celotex before closing does not equate with knowledge of asbestos contamination that would remain in the ground after closing or with knowledge that asbestos previously had been used as a raw material in the manufacturing process on the Property. The Celotex Parties emphasize that the purchase price under the Contract allegedly was set at approximately half the Property's fair market value if it were uncontaminated, because Warehouse Associates allegedly knew that there was significant contamination on the Property. In support of this argument, the Celotex Parties cite an April 27, 2000 appraisal of the Property done for Warehouse Associates's lender that valued the Property at $3,465,000, presuming no environmental contamination. This appraisal, which was completed after the inspection period under the Contract had expired, states that, according to a representative of Warehouse Associates, the Property "was believed to be contaminated and priced accordingly." At her deposition, the lender's appraiser could not recall the individual at Warehouse Associates to whom she referred in this statement. The appraiser also stated that, from what she recalled, the contamination to which she referred was contamination that had to do with the buildings on the Property that were being demolished. The summary-judgment evidence does not prove as a matter of law that Warehouse Associates and Celotex discounted the Property's market value by fifty percent based on environmental contamination. Rather, it includes testimony by Celotex's own real-estate broker stating that, with the structures, storage tanks, and equipment removed and presuming no contamination, he believed the "full market price" for the Property was approximately three dollars per square foot, which would yield a value of approximately $1,613,000. Under this valuation, Warehouse Associates paid either fair market value or more than fair market value for the Property, presuming it was not contaminated.

The Celotex Parties also cite a one-page bankruptcy petition as well as deeds and corporate records sent by the title company to Warehouse Associates's lawyer, who received these documents on April 18, 2000. The Celotex Parties assert that these documents show that the Property had been owned by an asbestos manufacturer and corporate predecessor of Celotex. Warehouse Associates did not receive these documents until after the inspection period had expired. These documents show that Celotex filed bankruptcy but do not reflect why it did so. Although the documents show that the Property had been owned by the Philip Carey Manufacturing Company, they do not state that Philip Carey or any other company manu-

factured asbestos products.[9] The Celotex Parties also assert that HBC's report shows that Warehouse Associates knew that asbestos was commonly used in asphalt shingles; however, the part of the HBC report cited states only that asbestos was commonly used in construction materials. It does not refer to asphalt shingles.[10]

The Celotex Parties also assert that the common use of asbestos in asphalt products, including Celotex products, is a matter of common knowledge. The parts of the record the Celotex Parties cite do not support this proposition, and the summary-judgment evidence does not show as a matter of law that this information is common knowledge.

In sum, the summary-judgment evidence raises a genuine issue of fact as to the *Prudential* fraudulent-inducement exception to the enforcement of the Contract Language. *See Kane*, 2005 WL 497484, at *6–7 (holding that trial court erred in granting summary judgment based on as-is clause because of fact issues as to fraudulent-inducement exception under *Prudential*); *Nelson*, 127 S.W.3d at 175–76 (con-

cluding sufficient evidence supported trial court's ruling that as-is and waiver-of-reliance provisions should not be enforced based on evidence that seller fraudulently induced buyer to enter into contract by concealment of existence of underground waste oil storage tank). Therefore, the trial court erred in granting summary judgment as to this issue, and we sustain Warehouse Associates's first issue to this extent.

### 2. Impairment of Inspection

Before we address the evidence regarding impairment of inspection, we must determine the scope of this *Prudential* exception. In its briefing, Warehouse Associates describes this exception broadly, stating that it applies if "[a] seller ... interferes with the buyer's *investigation* of the property." [11] As explained below, we construe this exception more narrowly in accordance with the language used by the Texas Supreme Court and in a manner that recognizes the distinct purpose for this exception.

---

9. The Celotex Parties assert that Warehouse Associates is charged with knowledge of all information in the "public record," such as documents filed in Celotex's bankruptcy case in Florida, the contents of the Federal Register, documents in public libraries, and documents available from the Texas Department of Health. The only case the Celotex Parties cite for this proposition is *Mooney v. Harlin*, 622 S.W.2d 83 (1981). However, the Texas Supreme Court later clarified that parties are not charged with knowledge of all public records. *See HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 886–87 (Tex.1998). The *Mooney* court held that a person interested in an estate admitted to probate is charged with notice of what the will provides and that a claim for fraud based on exclusion from a will must be brought within the applicable limitations period. *See id.* at 887. However, the *Mooney* case cannot fairly be interpreted to mean that parties are charged with knowledge of all public records. *See id.*

10. The Celotex Parties also rely on one page of HBC's April 19, 2000 report, which states that "white fluff material" was found at approximately a twelve-foot depth in one of the soil borings done by HBC. The report does not say that this material was asbestos. Although this material's characteristics could have raised suspicions that the material was asbestos, the summary-judgment record does not show that Warehouse Associates learned of the discovery of this material before the end of the inspection period. In any event, even if Warehouse Associates knew during the inspection period that there was white fluff material in one soil boring, this knowledge would not prove as a matter of law that Warehouse Associates knew the soil on the Property was contaminated with asbestos.

11. (emphasis added).

We begin by examining the language used by the *Prudential* court to describe this exception:

> [A] buyer is not bound by an "as is" agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct. A seller cannot obstruct an *inspection* for defects in his property and still insist that the buyer take it "as is".

*Prudential Ins. Co. of Am.*, 896 S.W.2d at 162. (emphasis added).

The only case we have found that actually analyzes the proper application of this exception is *Prudential* itself.[12] *See id.* at 163. In *Prudential*, the buyer asserted the seller had "interfered with his investigation" by withholding plans and specifications the buyer had requested. *See id.* The *Prudential* court stated that withholding such plans and specifications could not have interfered with the buyer's inspection. It noted that the withheld plans and specifications did not mention if an asbestos-containing material was used in the construction of the building and that the only way to determine whether the building contained asbestos was to "inspect the premises." *See id.* According to the *Pru-*

*dential* court, the buyer did not claim that the seller had interfered with his inspection in any way. *See id.* By this statement, the *Prudential* court recognized a distinction between an inspection of the property and an investigation of that property. The *Prudential* court noted that the buyer was asserting that the seller had interfered with its *investigation* of the property by withholding information about the property but that this assertion was not equivalent to an assertion that the seller had interfered with the buyer's *inspection* of the property. *See id.*

■ This distinction is consistent with the plain meaning of these words; "inspect" focuses on a careful physical examination, whereas "investigation" includes a physical examination as well as a gathering of information through research and study. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1170 (1993 ed.) (defining "inspect" as "to view closely and critically (as in order to ascertain quality or state, detect errors, or otherwise appraise): examine with care: SCRUTINIZE" and defining "inspection" as "the act or process of inspecting: a strict or close examination . . . the examination of

---

**12.** Warehouse Associates cites *Kane* and *Nelson*. *See Kane*, 2005 WL 497484, at *6–8; *Nelson*, 127 S.W.3d at 175–76. Though these cases allude to impairment of inspection, they do not contain any analysis of what constitutes impairment of inspection. *See Kane*, 2005 WL 497484, at *6–8; *Nelson*, 127 S.W.3d at 175–76. *Kane* indicates that the seller's fraudulent misrepresentations regarding the car in question discouraged the buyer from inspecting the car before buying it. *See Kane*, 2005 WL 497484, at *1, 6–8. Nonetheless, there was a fact issue as to whether those same alleged fraudulent misrepresentations (as well as others) induced the buyer to purchase the car, and the intermediate court based its ruling on the fraudulent-inducement exception. *See id.* In *Nelson*, the court states in passing that the seller thwarted the buyer's attempt to inspect the real property in ques-

tion and notes that the seller told the buyer that an inspection was unnecessary, a waste of money, and that he had been operating the gas station for thirty years with no problems from the government. *See Nelson*, 127 S.W.3d at 173, 175. Though the buyer apparently took the seller's advice and declined to exercise his right to conduct an environmental inspection, the intermediate court based its decision on the fraudulent-inducement exception and did not analyze whether the impairment-of-inspection exception applied. *See id.* at 175–76. Because the *Nelson* court's focus is not on the impairment issue, it is not clear whether the seller simply discouraged the buyer from choosing to conduct an environmental inspection or whether the seller also denied the buyer access to the property for such an inspection. *See id.* at 173, 175–76.

articles of commerce to determine their fitness for transportation or sale"); *id.* at 1189 (defining "investigate" as "to observe or study closely: inquire into systematically: EXAMINE, SCRUTINIZE" and defining "investigation" as "the act or process of investigating: detailed examination: STUDY, RESEARCH"). In the absence of further guidance from the Texas Supreme Court, we conclude that the *Prudential* court intended the second *Prudential* exception to apply to a seller's conduct that impairs, obstructs, or interferes with a buyer's *inspection* of the property being sold but not to conduct that impairs, obstructs, or interferes with a buyer's *investigation* of that property. *See id; Prudential Ins. Co. of Am.*, 896 S.W.2d at 162–63. Therefore, to trigger the impairment-of-inspection exception, the seller, by its conduct, must impair, obstruct, or interfere with the buyer's exercise of its contractual right to carefully view, observe, and physically examine the property. Conduct by the seller that impairs, obstructs, or interferes with the buyer's ability to obtain information regarding the property does not trigger this exception.

■ It is important to recognize that, in analyzing the applicability of the impairment-of-inspection exception, we presume there was no fraudulent inducement of any party to enter into the contract containing the as-is or waiver-of-reliance language. In other fact patterns, conduct that allegedly fraudulently induced a party to enter into the contract may be mixed with conduct that allegedly impaired a party's ability to inspect the property before entering into the contract. However, no such facts are contained in the record before us. Whatever the fact pattern may be, we still analyze the impairment-of-inspection exception separately from the fraudulent-inducement exception. *See Prudential Ins.*

*Co. of Am.*, 896 S.W.2d at 162–63. Although Warehouse Associates asserts that both exceptions apply in this case, in analyzing the impairment-of-inspection exception, we presume that there has been no fraudulent inducement to enter into the contract.

■ If, in the absence of duress or fraudulent inducement, a sophisticated buyer and seller freely enter into an as-is real estate sales transaction in which the buyer agrees not to rely upon any warranty by the seller (other than seller's warranty of title in the deed) or upon the seller's statements or representations or upon any other information provided by the seller, then it would not be reasonable to refuse enforcement of the parties' agreement based on the buyer's alleged reliance on the seller's statements in conducting the buyer's inspection. If statements upon which the buyer is not supposed to rely alone are sufficient to constitute impairment of inspection in a transaction involving sophisticated parties, then the exception would swallow the rule and render the waiver-of-reliance language and the "as is" nature of the transaction meaningless. In this case, sophisticated parties, represented by counsel, structured an arm's length commercial transaction in a way that allocated the risk of discovering adverse property conditions entirely to the buyer, and the parties placed the burden of inspecting the property for such conditions entirely on the buyer. Under these circumstances, it is reasonable to enforce these contractual provisions. Likewise, it would be reasonable to refuse enforcement of these contractual provisions if the seller engaged in conduct that impaired, obstructed, or interfered with the buyer's exercise of its contractual right to carefully view, observe, or physically examine the property.

This interpretation follows from the *Prudential* court's analysis of whether the

impairment-of-inspection exception applied in that case. *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 162–63. This interpretation is also faithful to the precise meaning of the words our high court used to define the standard. *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 162 (stating that the buyer is not bound by as-is and waiver-of-reliance language "if he is entitled to *inspect the condition of what is being sold* but is impaired by the seller's conduct") (emphasis added). And, importantly, this interpretation also makes sense in the context of these types of transactions.

■ Turning to the summary-judgment evidence, Warehouse Associates asserts there is a genuine issue of fact as to the impairment-of-inspection exception based on summary-judgment evidence showing the following:

● Celotex knew that, on February 10, 2000, while performing an excavation, Eagle Construction & Environmental Services, Inc. ("Eagle") had uncovered what appeared to Eagle's employee to be a large ball of raw asbestos buried in the ground on the Property.

● When asked by Eagle what to do with this suspected asbestos-containing material, Celotex instructed Eagle "backfill the excavation," that is, to cover the material with dirt and leave that area alone.

● Celotex knew asbestos waste had been buried in the soil on the Property, and Colburn knew that Eagle recently had discovered suspected asbestos-containing material, yet Colburn did not mention the issue of asbestos in the soil to HBC. Colburn stated that he was not aware of any environmental concerns other than those he had discussed. Colburn told HBC that, to his knowledge, there was no hazardous waste or any kind of contamination on the ground.

● Celotex knew that in the past asbestos had been used in the manufacturing process in the plant on the Property. However, Murry told HBC (1) the only product Celotex manufactured on the Property was asphaltic roofing shingles; (2) the wastes associated with the process were "dumpster-type of waste" that did not need to be listed on a manifest for disposing of regulated materials; (3) Celotex's manufacturing was similar throughout the tenure of Celotex's operation for twenty to thirty years; (4) this manufacturing process did not really generate any waste except for what went into "dumpsters or roll-off boxes"; and (5) the company that previously operated the site also made asphaltic roofing materials in a manner similar to Celotex.

● Celotex did not give HBC or Warehouse Associates the 1988 plant map and the part of the 1996 environmental assessment that indicate that asbestos had been used in the manufacturing process on the Property in the past.

● Celotex refused to agree to remove the concrete slabs that remained after removal of the structures from the Property.

Almost all of the evidence cited by Warehouse Associates shows alleged fraudulent misrepresentations or nondisclosures of information by Celotex concerning the condition or prior use of the Property. As discussed above, even presuming the truth of all such evidence, this proof does not raise a fact issue as to Celotex's alleged impairment of Warehouse Associates's inspection of the Property. *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 162–63. Celotex's failure to gratuitously remove the concrete slabs under the structures it had demolished and

removed did not impair Warehouse Associates's inspection. The parties agreed in the Contract that the concrete slabs would be left in place. The summary-judgment evidence does not reflect that it was impossible for Warehouse Associates to test the soil under these slabs. In any event, these slabs were a preexisting part of the Property, and Celotex's failure to remove them cannot constitute an impairment of Warehouse Associates's inspection. Celotex's instruction to its contractor to backfill the excavation containing the suspected asbestos-containing material returned the Property to its prior condition before the contractor began excavating. There is no evidence that Celotex removed any suspected asbestos-containing material from the soil, and Warehouse Associates was free to test any part of the Property, including this particular material. In fact, near the end of the inspection period, Celotex gave HBC a map showing areas of the Property that had been backfilled. HBC did not attempt to take soil samples from these areas.

Warehouse Associates does not assert on appeal that Celotex impaired, obstructed, or interfered with its ability to carefully view, observe, and physically examine the Property. The summary-judgment evidence shows that Warehouse Associates and HBC had access to the Property and were free to take whatever soil and water samples they wanted to take for testing.[12] The record shows that, if Warehouse Associates or its contractor had tested seventy soil borings taken from all over the Property for asbestos, as was done after the closing of the sale, Warehouse Associates would have discovered the asbestos contamination in the soil. Celotex did not impair Warehouse Associates's ability to perform such testing. Warehouse Associates and its contractor chose not to do so. Warehouse Associates argues that Colburn made fraudulent misrepresentations and failed to disclose material facts to HBC, allegedly knowing that HBC would rely upon this information in deciding what type of soil testing to do in its inspection. Although there is evidence to the contrary,[13] even presuming that this is true, such fraudulent conduct would not have impaired Warehouse Associates's ability to view, observe, and physically examine the Property. As discussed above, under the applicable legal standard, we do not consider the impact of any alleged statements by the seller regarding the condition of the Property on the buyer's decision as to what kind of inspection to undertake. Consistent with the context of a sale on an "as is" basis with a waiver-of-reliance provision in the contract, in determining the applicability of the impairment-of-inspection exception, we consider only the impact

---

12. Although not asserted by Warehouse Associates on appeal, some summary-judgment evidence indicates that HBC was not able to visit the Property until February 21, 2000 because of ongoing work being performed by Eagle. However, at his deposition, Martens of HBC characterized this situation as a delay or postponement of HBC's appointment to February 21, 2000, rather than as an unsuccessful attempt to visit the Property. Martens did not indicate that this delay caused HBC any problems in its work, and he testified that HBC had full access to the Property on the dates that it visited the Property. Martens testified that HBC visited and inspected the Property on February 21 and 24, 2000, and that HBC did not need to revisit the site after February 24, 2000, to complete its Phase I report. HBC returned to the Property on March 14, 2000, and took soil and water samples.

13. For example, Colburn testified at his deposition that he understood that Warehouse Associates was a sophisticated buyer that was doing its own environmental evaluation of the Property and that Warehouse Associates was not relying on any information Celotex provided.

of the seller's conduct on the buyer's actual inspection of the property's condition.

Except for the warranty of title contained in the deed, Warehouse Associates agreed not to rely upon any statements by Celotex regarding the Property, and it bargained for the opportunity to conduct an independent investigation and inspection before closing the sale. The scope of this investigation and inspection was solely Warehouse Associates's decision. As a practical matter, Warehouse Associates could choose to rely upon or be influenced by Celotex's statements in deciding the scope of its environmental testing and inspection; however, if it chose to do so, it did so at its peril and that decision provides no basis to avoid enforcement of the Contract Language. As the buyer, Warehouse Associates had to decide the nature and scope of its environmental investigation and inspection because it is the one who either had to accept the property "as is" or decline to proceed with the transaction, without relying on anything Celotex said. Under the Contract, Celotex had no obligation to furnish any documents or records regarding the Property and made no warranties, representations, covenants, or promises regarding the Property's condition. Given the structure of this transaction and the sophistication of the parties, in assessing whether Celotex impaired the inspection, it is not appropriate to focus on whether Celotex's statements impacted Warehouse Associates's decision-making process as to the depth and breadth of the inspection; the parties agreed that decision was for Warehouse Associates to make, with Warehouse Associates assuming the risks of opting for a less thorough, less expensive, and less time-consuming inspection of the Property.

In sum, Warehouse Associates does not assert, and the record does not show, a fact issue as to whether Celotex impaired, obstructed, or interfered with Warehouse Associates's exercise of its contractual right to carefully view, observe, and physically examine the Property. We conclude that the summary-judgment evidence proved as a matter of law that Celotex did not engage in conduct that impaired, obstructed, or interfered with Warehouse Associates's inspection of the Property. Therefore, the impairment-of-inspection exception provides no basis to bar enforcement of the Contract Language. Accordingly, we overrule Warehouse Associates's first issue to the extent it alleges the summary-judgment evidence raises a genuine issue of fact as to the impairment-of-inspection exception.

**C. Does Warehouse Associates's independent investigation of the Property's condition preclude its assertion that it was induced to enter into the Contract by a fraudulent representation or concealment of information by Celotex?**

In the trial court and on appeal, the Celotex Parties also have argued, without relying on the Contract Language, that Warehouse Associates's claims fail as a matter of law under *Bartlett v. Schmidt* because Warehouse Associates undertook its own investigation of the Property's environmental condition. *See* 33 S.W.3d 35, 37–38 (Tex.App.-Corpus Christi 2000, pet. denied). In *Bartlett*, the court relies primarily on *Marcus v. Kinabrew*, 438 S.W.2d 431, 432 (Tex.Civ.App.-Tyler 1969, no writ). *See Bartlett*, 33 S.W.3d at 38. *Bartlett* did not involve as-is or waiver-of-reliance language, and it did not cite *Prudential* or *Schlumberger*. *See id.* To the extent that *Bartlett, Marcus,* or the cases cited therein hold that a buyer's independent investigation, without more, is sufficient as a matter of law to defeat an assertion that the seller fraudulently induced the buyer to enter into the contract,

these cases are contrary to *Prudential,* *Schlumberger,* and the cases cited therein. *See Schlumberger Tech. Corp.,* 959 S.W.2d at 179–81; *Prudential Ins. Co. of Am.,* 896 S.W.2d at 162–63. Therefore, the trial court erred if it granted summary judgment based on this ground of the Celotex Parties' motion. Accordingly, we sustain Warehouse Associates's second issue to this extent.

**D. Did the trial court err in granting summary judgment based on the doctrines of estoppel by contract and estoppel by deed?**

█ The Celotex Parties also moved for summary judgment based on the doctrines of estoppel by contract and estoppel by deed. The Celotex Parties assert that, under these doctrines, the terms of the Contract bind Warehouse Associates so that Warehouse Associates cannot take a position inconsistent with these terms. First, the Texas Supreme Court has indicated that, if either of the two *Prudential* exceptions apply, a party may take a position inconsistent with the waiver-of-reliance and as-is language in that party's contract. *See Prudential Ins. Co.,* 896 S.W.2d at 162. Second, the doctrines of estoppel by contract or by deed apply only in the absence of fraud. *See, e.g., Masterson v. Bouldin,* 151 S.W.2d 301, 307 (Tex. Civ.App.-Eastland 1941, writ ref'd) (stating that "If, in making a contract, the parties agree upon or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands, *in the absence of fraud* ... ") (emphasis added, quotations omitted). Because the summary-judgment evidence raises fact issues as to the fraudulent-inducement exception under *Prudential,* we conclude the trial court erred to the extent it based its summary judgment on the doctrines of estoppel by contract and

estoppel by deed. Accordingly, we sustain Warehouse Associates's third issue.

**V. CONCLUSION**

Based on the record before this court, we conclude that this case does not fall within the scope of *Schlumberger Technology Corp. v. Swanson.* After carefully reviewing the summary-judgment evidence under the applicable standard of review, we conclude that there is a genuine issue of fact as to whether Warehouse Associates was induced to enter into the Contract by Celotex's alleged fraudulent misrepresentation or concealment of asbestos contamination in the soil on the Property. Based on *Prudential,* we conclude that the impairment-of-inspection exception is limited to conduct by the seller that impairs, obstructs, or interferes with the buyer's exercise of its contractual right to carefully view, observe, and physically examine the property. Under the applicable standard of review, we conclude that the summary-judgment evidence proves as a matter of law that Celotex did not engage in such conduct. The Celotex Parties argue that, absent reliance upon the Contract Language, Warehouse Associates's claims fail as a matter of law under *Bartlett v. Schmidt.* This argument lacks merit and does not provide a basis for this court to affirm the trial court's judgment. Because of the genuine issue of fact as to the fraudulent-inducement exception, the trial court erred in enforcing the Contract language as a matter of law and in granting summary judgment based on the doctrines of estoppel by contract and estoppel by deed.

In its fourth issue, Warehouse Associates argues that the Celotex Parties were not entitled to partial summary judgment limiting Warehouse Associates's potential damage recovery based on various arguments the Celotex Parties asserted in their

summary-judgment motion. However, in its final judgment, the trial court granted the Celotex Parties' "Motion for Partial and Full Summary Judgment *that Plaintiffs take nothing on all their claims.*" (emphasis added). In this judgment, the trial court ordered that Warehouse Associates take nothing and that its claims be dismissed with prejudice. In the part of the motion for summary judgment attacked in Warehouse Associates's fourth issue, the Celotex Parties asserted various ways in which they claimed Warehouse Associates's damages would be limited even if liability were established. For example, they asserted that Warehouse Associates could not recover lost profits. The Celotex Parties did not argue that, upon a finding of fraud, Warehouse Associates would not be entitled to rescind the Contract.[14] The Celotex Parties did not assert that Warehouse Associates suffered no damages at all as a matter of law. Because the grounds in this part of the motion do not seek a take-nothing judgment against Warehouse Associates, they are not independent grounds for the take-nothing summary judgment granted by the trial court. Therefore, we need not and do not consider these issues on appeal. Accordingly, we do not reach Warehouse Associates's fourth issue.

In accordance with our rulings in this appeal, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.

14. At times, the Celotex Parties appear to argue that Celotex's offer to Warehouse Associates to buy back the Property is equivalent to the remedy of equitable rescission. Given that such a reconveyance would not affect the validity of the prior conveyance from Celotex, would not resolve the claims in this case, and would not involve a finding that the Celotex Parties committed fraud, we do not view such a repurchase as being equivalent to a rescission remedy based on fraud.