Opinion filed July 24, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed July 24,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00264-CV 

                                                    __________

 

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND

FOUR PARTNERS, LLC D/B/A PRIZM PARTNERS AND D/B/A
UNITED

COMMERCIAL PROPERTY SERVICES, Appellants 

 

V.

 

ITALIAN COWBOY PARTNERS, LTD., FRANCESCO SECCHI, AND

JANE SECCHI, Appellees 

 



 

On Appeal from the County Court at Law No. 3

 Dallas County, Texas

Trial Court Cause No. CC-01-07465-C

 



 

                                                     O P I N I O N








Asserting
causes of action for statutory fraud, common-law fraud, negligent
misrepresentation, mistake, breach of warranty of suitability, constructive
eviction, and breach of the covenant of quiet enjoyment, Italian Cowboy
Partners, Ltd. (ICP), Francesco Secchi, and Jane Secchi sued the Prudential
Insurance Company of America and Prizm Partners in connection with the lease of
restaurant property.[1]  Prudential
filed a counterclaim against ICP for unpaid rent and other damages.  It also
filed a counterclaim against the Secchis for breach of a personal guaranty. 
After a bench trial, the trial court entered judgment for ICP and the Secchis
for $1,286,084.60.  It also awarded appellate attorney=s fees of $75,000 in the event of an appeal to
the court of appeals, $40,000 if a Apetition
for review is made@ to
the supreme court, and $25,000 in the event the petition is granted by the
supreme court.  The trial court also awarded $50,000 as exemplary damages
against Four Partners, LLC d/b/a Prizm Partners and d/b/a United Commercial
Property Services.[2]  The trial
court also denied Prudential=s
counterclaims.  We reverse and render judgment that ICP and the Secchis take
nothing.  We reverse and remand on the issue of Prudential=s damages and attorney=s fees.

Background
Facts

The
Secchis had been in the restaurant business as operators or owners for about
twenty-three  years.  They had been involved in the restaurant business in the
Dallas area since1981.  In 1983, the Secchis opened, with financial help from
investors, a restaurant known as Ferrari=s. 
Ferrari=s was an
upscale restaurant first located on Market Street in the West End area of
Dallas next to Spaghetti Warehouse.  In 1990, the Secchis relocated Ferrari=s to the Brewery Building
in the same general area, but away from the West End.  The Secchis relocated
Ferrari=s to a
location in Addison in 1994, and they changed the name to Ferrari=s Villa.  Ferrari=s Villa was still operating
profitably at the time this lawsuit was tried in 2005.

With
the aid of additional investors, the Secchis expanded and opened a second
restaurant, Il Grano, in 1997.  Il Grano was a Aself-service@ restaurant located in
Plano.  The Secchis also were operating this restaurant profitably at the time
of the trial.








The
Secchis wanted to expand their restaurant business.  In late 1999 and early
2000, with the help of their real estate broker, the Secchis began to look for
additional restaurant property.  As the Secchis had done when they opened or
relocated their other restaurants, they performed demographic studies of
various locations, studied restaurant reports prepared by the Texas Alcoholic
Beverage Commission, and drove by or visited many sites in connection with
their search for a location for their new restaurant.  Hudson=s Grill was a restaurant
located in a building at Keystone Park Shopping Center.  Keystone Park, as well
as the Hudson=s Grill
building, was owned by Prudential.  The Secchis=
broker told them that Hudson=s
Grill was probably going to close and that the restaurant site might be coming
up for lease.  The Secchis were familiar with the shopping center and had
driven by it before.  As a part of their continuing feasibility study, they
often ate at other restaurants located in Keystone Park.  These restaurants
included Razzoo=s,
Bone Daddy=s, and
El Chico=s. 
Using various means at their disposal, the Secchis discovered that the other
restaurants in Keystone Park were operating profitably.

Prizm
was a property manager for Prudential.  In February 2000, the Secchis met with
Frances Fox Powell, Director of Property Management for Prizm, and discussed the
Hudson=s Grill
building.  In May 2000, the Secchis executed a letter of intent to lease the
property.  The parties began to negotiate the terms of the lease and of a
personal guaranty to be signed by the Secchis.  The Secchis= broker and attorney
assisted them in negotiating the final lease terms.  At least seven different
drafts of the lease were circulated during this period of time.  Also, during
this period of time, the Secchis visited the site that is the subject of this
lawsuit on several occasions.  At times, the Secchis met with Prizm=s agents at the property,
and at other times, they would get a key from Prizm and go to the property without
anyone from Prizm being present.  Hudson=s
Grill had closed by this time, and no restaurant operations were being
conducted on the premises.

Negotiations
continued for about five months.  The parties signed the lease in October
2000.  The lease was executed by Francesco Secchi as manager of Secchi, LLC,
the General Partner of ICP.  The Secchis executed a personal guaranty of the
lease.

After
the parties executed the lease, ICP began remodeling the property.  In December
2000, while ICP was remodeling the building, several different persons told
Francesco Secchi that there had been a sewer gas odor problem in the restaurant
when it was operated by Hudson=s
Grill.  Francesco Secchi also personally noticed the odor.  He told Powell
about the problem but continued to remodel.








Italian
Cowboy actually opened on March 1, 2001 (the Asoft
opening@), but the
grand opening was not until April 9, 2001.  After Italian Cowboy was
operational and opened for business, the sewer gas odor problem continued.

Although
Prudential attempted to solve the problem, the transient sewer gas odor
remained the same.[3]  Italian
Cowboy remained open, and ICP paid rent on the premises in March, April, May,
and June 2001.  ICP did not pay rent for July 2001 or for any month after
that.  Italian Cowboy closed on July 14, 2001.  This lawsuit was filed two days
earlier on July 12, 2001.

After
a bench trial, the trial court made detailed findings of fact and conclusions
of law.  We have not been cited to any standards of review, but they are well
known.  Findings of fact entered after a bench trial have the same force and
effect as jury answers.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  We conduct a review of those findings for factual
sufficiency under the same standards that we apply when reviewing jury
answers.  While a court of appeals cannot make original findings of fact, it
can Aunfind@ facts.  Tex. Nat=l Bank v. Karnes,
717 S.W.2d 901, 903 (Tex. 1986).  Although conclusions of law may not be
reviewed for factual sufficiency, a court of appeals may review them to
determine their correctness under the facts.  Keisling v. Landrum, 218
S.W.3d 737, 741 (Tex. App.CFort
Worth 2007, pet. denied).  We review conclusions of law de novo.  Reliance
Nat=l Indem.
Co. v. Advance=d
Temps., Inc., 227 S.W.3d 46 (Tex. 2007); Bastian Material Handling,
L.L.C. v. Stelluti Kerr, L.L.C., 229 S.W.3d 407, 409 (Tex. App.CEastland 2007, no pet.).

Fraud
and Negligent Representation Claims








We
will first address issues surrounding the common-law fraud claim, the statutory
fraud claim, and the negligent misrepresentation claim made against Prudential
and Prizm. Common-law fraud may be proven by a showing that there has been a
material representation, that the representation was false, that it was known
to be false when made or was made recklessly as a positive assertion without
knowledge of its truth, that it was intended to be acted upon, that it was
relied upon, and that it caused injury.   Ins. Co. of N. Am. v. Morris,
981 S.W.2d 667, 674 (Tex. 1998).

Tex. Bus. & Com. Code Ann. ' 27.01(a)(1) (Vernon 2002)
is the basis for the statutory fraud claim.  Section 27.01(a)(1) provides, in
parts relevant to this section of our opinion, as follows:

(a)
Fraud in a transaction involving real estate or stock in a corporation or joint
stock company consists of a

 

(1)
false representation of a past or existing material fact, when the false representation
is

 

(A)
made to a person for the purpose of inducing that person to enter into a
contract; and

 

(B)
relied on by that person in entering into that contract[.]

 

A
cause of action for negligent misrepresentation requires proof that there has
been a representation by a person in the course of business or in a transaction
in which he has a pecuniary interest, that false information is supplied to
another for the guidance of that other person in their business, that the one
making the misrepresentation did not exercise reasonable care or competence in
obtaining the information or communicating the information, and that there has
been a pecuniary loss suffered by one justifiably relying on the
misrepresentation.  Fed. Land Bank Ass=n
of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991); Trans‑Gulf
Corp. v. Performance Aircraft Servs., Inc., 82 S.W.3d 691, 696 (Tex. App.CEastland 2002, no pet.).

The
trial court found that Powell, the director of property for Prizm, made the
following statements to the Secchis during lease negotiations:

a. 
The Secchis were lucky to be able to lease the Premises because the building on
the Premises was practically new and was problem-free;

 

b. 
No problems had been experienced with the Premises by the prior tenant;

 

c. 
The building on the Premises was a perfect restaurant site and that the Secchis
could get into the building as a restaurant site for next to nothing;

 








d. 
Given Fran Powell=s
superior and special knowledge, these matters were represented by PRIZM and
Prudential as facts, not opinions.  Fran Powell did not think the building was
perfect at the time she told the Secchis it was.

 

The trial court also found that the statements were
false; that Powell and therefore Prizm and Prudential knew that they were
false; and that they intended for the Secchis and ICP to rely upon them. 
Further, the trial court found that the Secchis and ICP relied on the
statements and would not have entered the lease and executed the guaranty if
the representations had not been made.  For purposes of this section of this
opinion, we take those findings as true.  See Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171, 178, 181 (Tex. 1997).

Prudential and Prizm argue that common-law fraud,
statutory fraud, and negligent misrepresentation all have the common element of
reliance and that ICP disclaimed any reliance on representations not contained
in the lease.  They maintain that the disclaimer conclusively negates reliance
and, therefore, that ICP and the Secchis cannot recover under any of these
three theories.

The lease between Prudential and ICP contained, in
relevant part, the following provisions:

14.18
Representations.  Tenant acknowledges that neither Landlord nor Landlord=s agents, employees or
contractors have made any representations or promises with respect to the Site,
the Shopping Center or this Lease except as expressly set forth herein.

 

14.21
Entire Agreement.  This Lease constitutes the entire agreement between
the parties hereto with respect to the subject matter hereof, and no subsequent
amendment or agreement shall be binding upon either party unless it is signed
by each party.

 

When
fraudulent or negligent misrepresentations have been made before a contract is
executed, may a party successfully prosecute fraud claims and negligent
misrepresentation claims when the contract contains provisions by which it is
agreed that there are no representations outside of the contract and that the
writing constitutes the entire agreement of the parties?   We believe that  the
answer to that question depends upon the circumstances surrounding the
particular transaction.








In
Schlumberger, 959 S.W.2d 171, the court discussed the history of Texas
cases in which disclaimer of reliance and merger clauses were addressed.  The
court made the observation that the early decisions on the subject were Anot entirely consistent.@  Schlumberger, 959
S.W.2d at 178.  Because the supreme court has already reviewed those early
cases, we see no need to repeat that review here.  Instead, we will begin with
a review of Schlumberger.

In
Schlumberger, the parties became involved in a dispute over their
business arrangement involving diamond mining operations on the ocean floor off
the coast of South Africa.  They reached an agreement by which they resolved
their dispute, and they executed a release in accordance with that agreement. 
The release contained a disclaimer of reliance.  Later, claiming that
Schlumberger had misrepresented the viability and value of the project, the
Swansons filed suit claiming that, as a result of the misrepresentations, they
had been fraudulently induced to enter into the release.  The jury found for
the Swansons on all issues.  The trial court rendered a judgment
notwithstanding the verdict.  That judgment was reversed by the court of
appeals, and judgment was rendered in accordance with the jury verdict.  We
think that it is of special note that, in reversing the court of appeals, the
supreme court specifically stated that it was required to assume that
Schlumberger made the representations and that they constituted actionable
fraudulent inducement.  Schlumberger, 959 S.W.2d at 178, 181.

The
Schlumberger court referred to its decision in Dallas Farm Machinery
Co. v. Reaves, 307 S.W.2d 233 (Tex. 1957), and noted the rule from that
case that, as a matter of policy, the effect of a merger clause can be avoided
based on fraud in the inducement.  Against that matter of public policy,
however, the Schlumberger court recognized Aa competing concern -- the ability of parties
to fully and finally resolve disputes between them.@  Schlumberger, 959 S.W.2d at 179. 
This court has held that the court=s
reasoning is not limited to those situations involving releases.  ISG State
Operations, Inc. v. Nat=l
Heritage Ins. Co., 234 S.W.3d 711 (Tex. App.CEastland
2007, pet. denied).  By providing for valid disclaimers of reliance and merger
clauses, parties can rely on the validity of these provisions to settle current
disputes as well as avoid future ones.  Acknowledging that such clauses can be
effectual even in the face of fraud in the inducement, the court said in Schlumberger,
AThe question is under
which circumstances such disclaimers are binding.@ 
959 S.W.2d at 179.








Well-established
rules of contract construction govern whether disclaimer and merger clauses are
valid.  Id.  We look to the lease and the circumstances surrounding its
formation to determine whether, in Paragraphs 14.18 and 14.21 of the lease, ICP
gave the requisite clear and unequivocal expression of intent necessary to
disclaim reliance on any misrepresentations of Prudential and Prizm.  Id.

In
Schlumberger, the court found these factors to be important to its
decision that the fraudulent inducement claim was foreclosed: (1) the parties
were attempting to end a situation in which they had become embroiled in a
dispute over the value and feasibility of the subject project, (2) highly
competent and able legal counsel were involved in negotiating the release, (3)
the parties were negotiating at arm=s
length, and (4) the parties were knowledgeable and sophisticated in business.  Schlumberger,
959 S.W.2d at 180.

Here,
Prudential, Prizm, and the Secchis had been negotiating the lease for
approximately five months.  During this five-month period of time, the Secchis
had visited the property many times, both with and without Prizm personnel
being present.

The
Secchis were successful restauranteurs.  They were operating two other
restaurants profitably at the time of the negotiations for the Keystone Park
location.  They had negotiated three separate leases on three separate
locations for Ferrari=s
and one lease for Il Grano.  Before they engaged in any business or leased any
property, including this one, the Secchis performed detailed demographic
studies, ate at different restaurants in the areas, studied restaurant reports
from the Texas Alcoholic Beverage Commission, studied financial figures from
other restaurants in the areas, as well as other studies.  They also performed
detailed projections of income so that they could measure Ahow the business [was]
going to go@ for the
benefit of themselves as well as any investors or any lenders.  On all of these
other occasions, the Secchis had partners who were attorneys, and they were
represented by counsel in all of the transactions.  In the negotiations for
this lease and guaranty, they were represented by counsel as well as by their
real estate broker.  There were at least seven drafts containing negotiated
revisions of the lease that were circulated over five months during  the
negotiations.  Although Francesco Secchi testified that he never read these
drafts, Jane Secchi said that she read the leases and discussed them with their
attorney.








Not
every disclaimer of reliance or merger clause will bar a fraudulent inducement
claim.  Schlumberger, 959 S.W.2d at 181.  However, when we review this
record and consider the circumstances surrounding the formation of the lease,
we find that the parties were represented by counsel as well as real estate
brokers both before and during the negotiations leading up to the signing of
the lease and guaranty.  The record also reveals that the parties to this arm=s length transaction were
sophisticated in dealings involving the leasing and the operation of restaurant
properties, that several drafts of the lease were circulated, and that various
changes were negotiated and made to both the lease and the guaranty.

We
assume parties to a contract intend that every provision in it is to have some
meaning.  Lenape Res. Corp. v. Tenn. Gas Pipeline Co., 925 S.W.2d 565,
574 (Tex. 1996).  When sophisticated business parties who have fully negotiated
a contract and who have been represented by attorneys or other professionals in
the field are dealing at arm=s
length, they should be able to enter a contract in which they effectively
disclaim reliance, or in which they agree that there are no representations
outside of the written contract, or in which they otherwise provide for
merger.  Such a rule will result in agreements with predictable results and
liability limitations that are well-defined.[4] 
Further, we believe that in this negotiated, redrafted lease agreement the
disclaimer and merger clauses must be considered to be a part of that
negotiated agreement and not simply boilerplate as found by the trial court. 
Under such circumstances, sophisticated parties who are represented by counsel
and other professionals certainly can bargain to have the details of any
representations upon which they are relying inserted into the contract, rather
than agreeing that there are none.








After
examining the circumstances surrounding the formation of the lease under this
record, we hold that the sophisticated business parties in this arm=s length transaction
clearly and unequivocally expressed their intent that they were not relying on
any representations made outside of the agreement.  The agreement that there
were no representations outside of the contract and that the lease constituted
the entire agreement between Prudential and ICP conclusively negates the
element of reliance in the common-law fraud claim, the statutory fraud claim,
and the negligent misrepresentation claim.  Here, there can be no recovery on
those claims, and for the reasons we have stated, Prudential and Prizm=s issues on appeal relative
to those claims are sustained.

Breach
of the Implied Warranty of Suitability

Because
the trial court also found in favor of ICP and the Secchis on their claim for
breach of the implied warranty of suitability, we next address that issue. 

In
Davidow v. Inwood North Professional Group - Phase I, 747 S.W.2d 373,
377 (Tex. 1988), the court held that, in a commercial lease, the lessor makes
an implied warranty that the premises are suitable for the intended commercial
purpose.  It said that what that meant was (1) at the inception of the lease,
(2) there were no latent defects in the facilities (3) that were vital to the
use of the premises (4) for their intended commercial purpose and (5) these
essential facilities would remain in a suitable condition.  747 S.W.2d at 377. 
It seems to be clear that using the clause, Athese
essential facilities will remain in a suitable condition,@ presupposes that the
lessor had a continuing duty to repair such Aessential
facilities@ that
contained the latent defects (emphasis added).  That is underscored by the
court=s statement
that, if  Athe parties
to a lease expressly agree that the tenant will repair certain defects,
then the provisions of the lease will control@
(emphasis added).  Id.  Therefore, the indication was that the implied
warranty of suitability for commercial purposes could be altered or waived.

In
Gym-N-I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 910 (Tex. 2007),
the court acknowledged that it did not decide in Davidow the manner in
which that waiver might occur.  In Snider, the parties expressly agreed
that the landlord made no express or implied warranties regarding Afitness or suitability for
a particular purpose or otherwise.@ 
Id. at 907 n.1.  They also expressly agreed that Aany implied warranties are expressly
disclaimed and excluded.@ 
Id.  The lease also contained a provision that the tenant accepts the
premises Aas is.@  While specifically not
deciding what the effect of the Aas
is@ provision would
have been absent the express waiver contained in the lease, the court did hold
that the implied warranty of suitability in a commercial lease could be
expressly disclaimed.  Snider, 220 S.W.3d at 912.  








As
a contrast to the implied warranty of suitability in the commercial lease
context, the court in Snider cited Centex Homes v. Buecher, 95
S.W.3d 266, 274 (Tex. 2002).  Centex involved the implied warranty of
habitability in a residential transaction.  That case stands for the
proposition that Athe
warranty of habitability can be waived only to the extent that defects are
adequately disclosed.@
Centex, 95 S.W.3d at 274.  It would seem, then, that, in a residential
transaction, the warranty of habitability cannot be waived as to latent
defects.  If disclosed, defects are not latent.  We write about this because,
in Snider, the court said: AWe
recognize that our holding today stands in contrast to the implied warranty of
habitability, which >can
be waived only to the extent that defects are adequately disclosed.=@  Snider, 220 S.W.3d at 913 (citing Centex,
95 S.W.3d at 274).  We take that to mean that, in the commercial lease context,
an express waiver of the implied warranty of suitability can be effective even
in the absence of disclosure.

            Here,
there is no express waiver of the implied warranty of suitability.  Rather, the
parties rely upon the placement of repair responsibilities in support of their
respective positions.

ICP
argues, and the trial court so found, that Paragraph 5.1 of the lease expanded
Prudential=s repair
obligations.  However, Paragraph 5.1 of the lease addresses the requirement
that, before ICP could make any exterior or structural alterations, it must
first obtain Prudential=s
approval.  As a matter of law, this paragraph does not place any repair
responsibilities on either party; it requires Prudential=s approval before ICP makes any exterior or
structural alterations.

In
Paragraph 5.2 of the lease, the parties agreed that Prudential would make all
repairs to the ACommon
Areas@ adjacent to the
premises A(other than
the Premises and its perimeter sidewalks).@ 
Prudential was also responsible for making Arepairs
to structural components of the Premises (other than the roof).@

The
parties defined ACommon
Areas@ as follows in
Paragraph 1.1 of the lease:

Those
areas, facilities, utilities, improvements, equipment and installations in the
Shopping Center which are provided, or which may be designated by Landlord, for
the nonexclusive use or benefit of Landlord and tenants of the AShopping Center,@  their employees, agents,
customers, licensees and invitees, including but not limited to the parking
areas, driveways, entrance/exitways, sidewalks, landscaped areas, water, gas
(if available), electric, storm and sanitary sewer lines and appurtenant
equipment.

 

 








The
parties also agreed in Paragraph 5.2 of the lease that ICP had the
responsibility to make:

[A]ll repairs to the
interior and non-structural components of the Premises, including but not
limited to the exterior and interior of the Premises and its perimeter
sidewalks, whether structural or non-structural, foreseen or unforeseen,
including but not limited to the storefront and all interior and exterior doors
and plateglass, and all electrical, plumbing, heating, ventilating, air
conditioning, sprinkler systems, and any other mechanical installations or
equipment serving the Premises or located therein, whether or not in or under
the floor slab or on the roof of the premises.

 

Prudential
and Prizm argue that the cause of the sewer odor problem was related to
plumbing, ventilating, air conditioning, or some other mechanical
installation.  They take the position that, because the lease placed the burden
to repair those things upon ICP, those provisions control over the implied
warranty of suitability.  In their arguments, ICP and the Secchis contend that
Prudential and Prizm ignore findings of fact regarding problems with a grease
trap that contributed to the sewer gas odor problem.  They also argue that,
because the grease trap was located in the ACommon
Area,@ Prudential was
obligated to repair it.

First,
in regard to findings of fact, when a contract is not ambiguous, the
construction of the written instrument is a question of law for the court.  See
MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650-51 (Tex.
1999).  We review the trial court=s
legal conclusions de novo.  See Barber v. Colo. Indep. Sch. Dist., 901
S.W.2d 447, 450 (Tex. 1995).

Prudential
argues that, in accordance with the terms of the lease, ICP was required to
make all repairs Aforeseen
or unforeseen@ to
the plumbing, ventilating, air conditioning, and Aany
other mechanical installations or equipment serving the Premises or located
therein@
(emphasis added).  It is the position of Prudential and Prizm that this
specific provision of the lease controls over the implied warranty of
suitability.  We agree.  The phrase Aforeseen
or unforeseen@ clearly
includes latent defects that might exist at the inception of the lease.  Any
other reading would render the phrase meaningless.  Generally, the parties to
an instrument intend every provision to have some effect.  Lenape, 925
S.W.2d at 574.








Again,
in Davidow, when the court defined the warranty of suitability, it
included this clause: A[A]nd
that these essential facilities will remain in a suitable condition.@ Davidow, 747 S.W.2d
at 377.  We believe that the addition of that clause by the court makes it
clear that the warranty exists only as to those conditions for which the
landlord bears the responsibility of repair.  In Coleman v. Rotana, Inc.,
778 S.W.2d 867 (Tex. App.CDallas
1989, writ denied), the court held that the warranty of suitability applied
only with respect to those physical or structural defects that the landlord had
the duty to repair.  We agree with the Dallas Court and with the position
asserted by Prudential and Prizm.

We
hold as a matter of law that the lease placed the burden upon ICP to make any
needed repairs, foreseen or unforeseen, to plumbing, heating, ventilating, air
conditioning, and mechanical installations or equipment serving the premises. 
As pointed out in the brief filed by ICP and the Secchis, Skoot=s, the tenant that leased
the premises after ICP left, made repairs that eliminated the odor problem.
Although ICP and the Secchis argue that the owner of Skoot=s Atotally altered the plumbing,@ the record shows that
there was one sewer gas line that was Ahooked
up at the wrong line going up to the roof.@ 
That was corrected, and the vent pipes on the roof were raised; the problem was
eliminated.  Although the owner of Skoot=s
did not make any repairs to the grease trap when it eliminated the sewer gas
odor, there was testimony regarding an earlier inspection in which it was
discovered that a grease trap had been incorrectly installed and that that
contributed to the odor.  ICP and the Secchis argue that this grease trap was
located in the ACommon
Area@ and, therefore,
that it was Prudential=s
responsibility to repair the problem.  The trial court also found that the
grease trap was located in the ACommon
Area.@  However, if we
take it to be true that the grease trap did contribute to the problem and that
it was located in the common area, the implied warranty of suitability would
not be implicated.  The implied warranty of suitability covers only the leased
premises.  See Davidow, 747 S.W.2d at 377; see also Coleman, 778
S.W.2d at 871.  Because the lease placed the burden of these repairs upon ICP,
those lease terms control over the implied warranty of suitability.  We sustain
Issue B(1) and B(2).

Constructive
Eviction and Covenant of Quiet Enjoyment








The
trial court also granted relief to ICP upon the causes of action for
constructive eviction  and for breach of the covenant of quiet enjoyment.  The
parties agree that both of these causes of action require the same proof.  The
elements for both causes of action are:  (1) an intention on the part of the
landlord that the tenant shall no longer enjoy the premises, (2) a material act
by the landlord that substantially interferes with the tenant=s intended use and
enjoyment of the premises, (3) an act that permanently deprives the tenant of
the use and enjoyment of the premises, and (4) abandonment of the premises
by the tenant within a reasonable time after the commission of the act.  Lazell
v. Stone, 123 S.W.3d 6, 11-12 (Tex. App.C
Houston [1st Dist.] 2003, pet. denied); Holmes v. P.K. Pipe & Tubing,
Inc., 856 S.W. 2d 530, 539 (Tex. App.CHouston
[1st Dist.] 1993, no writ).

Prudential
and Prizm maintain that there is no evidence of any intent that ICP would no
longer enjoy the premises.  They also argue, in effect, that there is no
evidence that they engaged in any conduct, affirmative or otherwise, that
substantially interfered with ICP=s
intended use and enjoyment of the premises.  According to Prudential and Prizm,
to show their lack of intent, they undertook to assist with the repairs at a
time that they maintain they were not required to do so.  ICP and the Secchis
counter that, by misrepresenting and omitting material facts, Prudential and
Prizm breached the covenant of quiet enjoyment and constructively evicted ICP.

ICP
and the Secchis rely upon Holmes.  In Holmes, a certain tract of
land had been used to dump chemical waste.  The Texas Department of Water
Resources mandated a clean-up and approved a waste disposal closure plan. 
Subsequently, Holmes, the owner of the property, leased it to Tenneco.  Tenneco
used the property to store pipe.  Only a portion of the property had been used
as a chemical waste dump.  But, that was the part upon which the initial pipe
inventory was stored.  Tenneco later sold the pipe to P.K. Pipe & Tubing,
Inc.  P.K. Pipe contacted Holmes about entering into a lease so that they could
continue to store the pipe they had bought from Tenneco as well as other pipe
there.  There was a dispute as to whether Holmes told P.K. Pipe about the
dump.  

Later,
it was discovered that the storage of the pipe over the waste dump potentially
could cause a problem with the reclamation and remediation work that had been
done there.  P.K. Pipe was required to move the pipe, and it sued Holmes for
breach of the lease agreement, misrepresentation, and another cause of action
not relevant here.  The case ultimately turned upon the Houston Court=s finding that P.K. Pipe
did not abandon the premises within a reasonable time after the discovery of
any misrepresentation and that, therefore, there was no breach of the covenant
of quiet enjoyment.  The court mentioned in its opinion that it Ais clear that a material
act by [Holmes] (his silence concerning the existence of the waste disposal
site) deprived P.K. Pipe of use and enjoyment of a portion of the
premises.@  Holmes,
856 S.W.2d at 539.








Prudential
and Prizm take the position that the latter comment by the court in Holmes is
dicta and further that precontractual behavior cannot be the basis for
establishing post-contractual intent.  We agree with Prudential and Prizm that
precontractual behavior cannot be the basis for establishing post-contractual
intent.  To hold otherwise would be to allow for constructive eviction or the
breach of the covenant of quiet enjoyment before a tenant came into possession
of the property under a lease.  We have not been able to find other cases in
which the court holds that acts occurring prior to the lease agreement
constitute constructive eviction or a breach of the covenant of quiet
enjoyment.

The
cases to which we have been cited and those that we have been able to find
involve acts of commission or omission occurring during the lease or rental
period.  See, e.g., Lazell, 123 S.W.3d 6 (The landlord changed
the locks on the property during the term of the lease and instructed the
tenant that she was no longer welcome on the property.); Fid. Mut. Life Ins.
Co. v. Robert P. Kaminsky, M.D. P.A, 768 S.W.2d 818 (Tex. App.CHouston [14th Dist.] 1989,
no writ) (A part of Dr. Kaminsky=s
practice involved performing elective abortions.  Protestors were causing
problems at his clinic located at the leased premises.  In the lease agreement,
the landlord agreed that it would provide certain security and other things
that it did not do.  The lease also had an express covenant of quiet
enjoyment.); Downtown Realty, Inc. v. 509 Tremont Bldg., Inc., 748
S.W.2d 309 (Tex. App.CHouston
[14th Dist] 1988, no writ) (The air conditioning system at the leased premises
failed during the lease term.  The landlord failed to make air conditioning
repairs during the lease term that it was required to make under the terms of
the lease.).

Even
if we assume that Powell did knowingly make false statements, she did not make
those statements during the lease term, and any such statements could not form
the basis for constructive eviction or for a breach of the covenant of quiet
enjoyment as a matter of law.  Prudential and Prizm=s Issue B(3) is sustained.

Mutual
or Unilateral Mistake








In
order to avoid an agreement based upon mutual mistake, a party must show that
there has been a mistake of fact, that the mistake is mutual, and that the
mutual mistake materially affects the agreed-upon exchange.  Barker v.
Roelke, 105 S.W.3d 75, 84 (Tex. App.CEastland
2003, pet. denied).  When there is a unilateral mistake of fact, courts will
grant relief when the conditions of remedial mistake are present.  James T.
Taylor & Son, Inc. v. Arlington Indep. Sch. Dist., 335 S.W.2d 371, 373
(Tex. 1960).  Although there may be others, some of the conditions of
remedial mistake as set forth by the Taylor court are:

(1) the mistake is
of so great a consequence that to enforce the contract as made would be
unconscionable; (2) the mistake relates to a material feature of the contract;
(3) the mistake must have been made regardless of the exercise of
ordinary care; and, (4) the parties can be placed in status quo in the equity sense,
i.e., rescission must not result in prejudice to the other party except for the
loss of his bargain.

 

Id.

In
their initial briefing, Prudential and Prizm direct their arguments to a claim
that ICP ratified the lease after discovering the sewer gas odor problem.  In
their reply brief, they attempt to expand their argument to include attacks on
one element of proof related to mutual mistake:  that the mistake materially
affects the agreed-upon exchange (see Barker, 105 S.W.3d at 84)
and one element of proof related to unilateral mistake (that the mistake is of
such a great consequence that to enforce the contract as made would be
unreasonable) (see James T. Taylor, 335 S.W.2d at 373).  Prudential and
Prizm do not, either in their original brief or in their reply brief, attack
any of the other elements related to either mutual mistake or unilateral
mistake.  Because it was the only issue raised in the initial briefing, we will
consider only the ratification argument.  See Howell v. Tex. Workers= Comp. Comm=n, 143 S.W.3d 416, 439
(Tex. App.CAustin
2004, pet. denied).  Further, even if we were to address mutual mistake and
unilateral mistake, none of the remaining elements of either are challenged. 
Insofar as Prudential and Prizm may have addressed mutual mistake and
unilateral mistake, those challenges are overruled, and we will proceed to
review their claim of ratification.

Ratification

This
court has held that a party ratifies an agreement when it recognizes the
validity of the agreement by acting under it, performing under it, or
affirmatively acknowledging it.  Barker, 105 S.W.3d at 84.  Ratification
may be express or it may be implied from a course of conduct.  Id. 
After a party has ratified an agreement, it may not withdraw the ratification
and attempt to avoid the agreement.  Id.  Acts that are inconsistent
with an intent to avoid the agreement have the effect of ratifying it.  Id.
at 85.  A person ratifies an agreement as a matter of law if the evidence is
not controverted or is incontrovertible.  Id.








Prudential
and Prizm argue in their original briefing that Athe
evidence conclusively establishes the [ICP and the Secchis] ratified the Lease
and the Guaranty after learning about the odor.@ 
We agree.  Assuming for the purposes of this section of our opinion the Secchis= testimony to be accurate,
we acknowledge that, each time Francesco Secchi noticed the sewer gas odor, he
contacted Powell and told her about the problem.  One day before the opening of
Italian Cowboy, Francesco Secchi noticed the sewer gas odor and again called
Powell.  The Asoft
opening@ of Italian
Cowboy was on March 1, 2001.  On March 5, 2001, an inspector from the City of
Dallas Department of Environmental Health Services came to Italian Cowboy in
response to a sewer odor complaint made by one of Italian Cowboy=s customers.  The inspector
issued a notice of violation.  Italian Cowboy had to close from 1:15 p.m. to
5:00 p.m. that day.  Francesco Secchi again called Powell to report the
continuing problem.  According to Francesco Secchi, Powell=s response to him was that
she could not understand why he complained all of the time.  He contacted her
because he was operating under the assumption that Prudential was responsible
for taking care of the cause of the odor problem.  The trial court found that
ICP=s interpretation
of the lease was that these repairs were Prudential=s responsibility.

In
June 2001, the Secchis met Darla Wahl.  Darla and her husband came to Italian
Cowboy as customers.  Darla worked for Hudson=s
Grill from February 1999 until it closed in February 2000.  She told the
Secchis that the same odor was in the building when she worked for Hudson=s Grill.  She also told
them about customers of Hudson=s
Grill complaining about the odor.  Francesco  Secchi testified that, after he
had talked with Wahl, he Arealized
that the landlord was not honest with us and we lost already half a million
dollars and that=s our
decision not to lose any more money.@

Whether
mutual or unilateral, the mistake of fact relied upon by ICP and the Secchis
was the fact of the presence of the sewer gas odor.  From the time that the
Secchis noticed the sewer gas odor problem, they consistently reported the
problem to Prizm.  Prudential attempted, at its expense, to resolve the odor
problem.  This would have been in accordance with Francesco Secchi=s understanding of
Prudential=s
obligations under the lease.








We
hold as a matter of law that, by continuing to insist upon Prudential=s performance under the lease,
ICP and the Secchis=
conduct in insisting that Prudential perform under the lease according to their
understanding of the lease (that the sewer gas odor problem was Prudential=s task to repair)
constitutes conduct that is inconsistent with an intention of avoiding the
lease.  By insisting that Prudential perform on its perceived obligations under
the lease, ICP indicated that it was relying on the validity of the lease, and
such conduct had the effect of waiving the right of rescission.  This is
consistent with ICP and the Secchis leaving the premises only after receiving a
letter from Powell, dated June 22, 2001, in which she notified ICP that, in
essence, Prudential was not going to continue to attempt to solve the sewer gas
problem unless certain conditions were met.  Prudential would pay for certain
currently recommended repairs only if the contractor would guarantee that the
repairs would solve the sewer gas odor problem and if ICP would agree to assume
all future repairs needed to solve any unresolved problems with sewer odors. 
There were other conditions that are not relevant here.  ICP and the Secchis
did not agree to the conditions. When ICP and the Secchis learned that
Prudential was no longer going to abide by what the Secchis believed Prudential=s responsibilities to be,
they filed this lawsuit on July 12, 2001, and the restaurant closed on July 14,
2001.

A
matter is conclusively established if ordinary minds could not differ as to the
conclusion to be drawn from the evidence.  Triton Oil & Gas Corp. v.
Marine Contractors & Supply, Inc., 644 S.W.2d 443, 446 (Tex. 1982). 
The trial court found that ICP had made that interpretation of the lease
provisions regarding repairs.  One can only conclude that ICP was expecting
Prudential to perform under its interpretation of the contract.  The evidence
we have set forth conclusively establishes that ICP ratified the lease by
taking actions that were inconsistent with an intent to avoid it.

Damages
Issues

Because
we have held that ICP and the Secchis are not entitled to recover on any of the
causes of actions alleged, we need not reach the arguments addressing damages.

Exemplary
Damages








The
trial court awarded ICP judgment for exemplary damages in the sum of $50,000
against Prizm.  From a reading of the briefs of the parties, it is clear that
the award of exemplary damages related to the statutory fraud claim.  Because
we have held that the statutory fraud claim (as well as the other tort claims)
is not viable, we reverse the award of exemplary damages against Prizm. 
Issue D(2) is sustained.

                                                                  Attorney=s Fees

Because
we are remanding a part of this cause and because ICP and the Secchis are no
longer the prevailing parties, we set aside the award of attorney=s fees to ICP and the
Secchis.

Prudential=s Counterclaims

The
trial court concluded that Prudential and Prizm were to take nothing from ICP
and the Secchis.  Therefore, there were no findings of fact regarding the
amount of Prudential=s
damages.  As we have stated, this court cannot find facts; we can only Aunfind@ them.  Tex. Nat=l Bank, 717 S.W.2d at
903.  Because we have found that ICP could not avoid the lease on any of the
theories alleged and because ICP quit paying rent to Prudential, ICP breached
its lease with Prudential.  Prudential is entitled to recover for that breach
in an amount to be determined by the trial court on remand.  Issue C(1) is
sustained.  For the same reasons, Prudential is entitled to recover on the
Secchis= guaranty
those sums as found by the trial court on remand.  Issue C(2) is sustained.
Furthermore, neither can we find facts with respect to Prudential and Prizm=s request for attorney=s fees.  Any amounts
awarded to Prudential and Prizm must be determined by the trial court.  We reverse
and remand Prudential=s
damage claim and Prudential and Prizm=s
claim for attorney=s
fees to the trial court.

This
Court=s Ruling

We
reverse the judgment of the trial court and render judgment that ICP and the
Secchis take nothing in their suit against Prudential and Prizm.  We render
judgment that ICP breached its lease agreement with Prudential and that the
Secchis are liable upon their guaranty.  We remand the issues regarding the
amount of damages due Prudential and the amount of any attorney=s fees to be awarded to
Prudential and Prizm.

 

JIM R. WRIGHT

July 24, 2008                                                                           CHIEF
JUSTICE             

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]The record shows that Prizm Partners and United
Commercial Property Services were names under which Four Partners, LLC,
conducted business.  The judgment in this case was entered against Prudential
and Four Partners, LLC.  The notice of appeal in this case was filed on behalf
of Prudential and Four Partners, LLC d/b/a Prizm Partners and d/b/a United
Commercial Property Services.





[2]We will refer to this entity as APrizm.@





[3]Although Prudential attempted to solve the sewer gas
problem, it and Prizm maintain that those repairs were the responsibility of
ICP under the terms of their lease.  The next tenant of the premises, Michael
David Leatherwood, associated with Razzoo=s
and Bone Daddy=s, opened a restaurant called ASkoot=s.@  He remedied the sewer gas problem by extending the
height of the sewer vent pipes on the roof and by rerouting a sewer gas line
going to the roof.





[4]See generally, Glenn D. West, letter to the Clerk of
the Supreme Court of Texas, dated September 8, 2006, and accompanying
attachments filed as amicus curiae in support of the petition for review in Celotex
Corporation v. Warehouse Assocs. Corporate Centre II, Inc., No. 06-0384,
now pending in the Supreme Court of Texas:  Glenn D. West & Benton B.
Bodamer, Corporations, 59 SMU L. Rev.
1143 (2006), and Glenn D. West & Benton B. Bodamer, Avoiding Fraud and
Other Extra-Contractual Claims: There May Be More to the Deal than the Contract
(presented to the Mergers and Acquisitions Institute, September 7-8, 2006,
Dallas, Texas).  West and Bodamer take the position that sophisticated parties
to a contract should be able to enter into an agreement by which they might Apredictably define their rights, liabilities, and
obligations by contract rather than open themselves up to a less clear and less
defined body of tort law to which their bargain was deliberately not made
subject.@  West & Bodamer, Corporations, 59 SMU L. Rev. at 1164.  

 

In Warehouse Assocs. Corp. Ctr. II, Inc.
v. Celotex Corp., 192 S.W.3d 225 (Tex. App.CHouston
[14th Dist.] 2006, pets. filed), the purchaser of commercial property sued the
seller alleging fraudulent inducement.  The buyer had agreed that it was not
relying upon any representations made by the seller (there were other
agreements pertinent to the question of reliance that do not exist in the case
before us).  In its lawsuit, Warehouse Associates claimed that Celotex and its
employees fraudulently induced Warehouse Associates into buying the property by
not disclosing the fact that there was asbestos on the premises.  The trial court
granted summary judgment to Celotex on all claims.  The court of appeals
reversed and remanded the case to the trial court.  The essence of the holding,
among other things, is that the parties to a contract cannot make an agreement
that forecloses them from later asserting that the contract was induced by
fraud, except in those situations in which the parties are settling an existing
dispute.  Warehouse Assocs., 192 S.W.3d 225.