The **PRUDENTIAL INSURANCE COM-PANY OF AMERICA and Four Part-ners, Llc d/b/a Prizm Partners and d/b/a United Commercial Property Services, Appellants,**

v.

**ITALIAN COWBOY PARTNERS, LTD., Francesco Secchi, and Jane Secchi, Appellees.**

No.  11–05–00264–CV.

Court of Appeals of Texas, Eastland.

July 24, 2008.

Rehearing Overruled Oct. 9, 2008.

---

G. Luke Ashley, John A. Mackintosh, Jr., Richard B. Phillips, Jr., Thompson & Knight, L.L.P, Dallas, TX, for Appellants.

Luke Madole, Ricardo Rochetti, Thomas F. Allen, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, for Appellees.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

JIM R. WRIGHT, Chief Justice.

Asserting causes of action for statutory fraud, common-law fraud, negligent misrepresentation, mistake, breach of warranty of suitability, constructive eviction, and breach of the covenant of quiet enjoyment, Italian Cowboy Partners, Ltd. (ICP), Francesco Secchi, and Jane Secchi sued the Prudential Insurance Company of America and Prizm Partners in connection with the lease of restaurant property.[1] Prudential filed a counterclaim against ICP for unpaid rent and other damages. It also filed a counterclaim against the Secchis for breach of a personal guaranty. After a bench trial, the trial court entered judgment for ICP and the Secchis for $1,286,084.60. It also awarded appellate attorney's fees of $75,000 in the event of an appeal to the court of appeals, $40,000 if a "petition for review is made" to the supreme court, and $25,000 in the event the petition is granted by the supreme court. The trial court also awarded $50,000 as exemplary damages against Four Partners, LLC d/b/a Prizm Partners and d/b/a United Commercial Property Services.[2] The trial court also denied Prudential's counterclaims. We reverse and render judgment that ICP and the Secchis take nothing. We reverse and remand on the issue of Prudential's damages and attorney's fees.

### Background Facts

The Secchis had been in the restaurant business as operators or owners for about twenty-three years. They had been involved in the restaurant business in the Dallas area since1981. In 1983, the Secchis opened, with financial help from investors, a restaurant known as Ferrari's. Ferrari's was an upscale restaurant first located on Market Street in the West End area of Dallas next to Spaghetti Warehouse. In 1990, the Secchis relocated Ferrari's to the Brewery Building in the same general area, but away from the West End. The Secchis relocated Ferrari's to a location in Addison in 1994, and they changed the name to Ferrari's Villa. Ferrari's Villa was still operating profitably at the time this lawsuit was tried in 2005.

With the aid of additional investors, the Secchis expanded and opened a second restaurant, Il Grano, in 1997. Il Grano was a "self-service" restaurant located in

---

1. The record shows that Prizm Partners and United Commercial Property Services were names under which Four Partners, LLC, conducted business. The judgment in this case was entered against Prudential and Four Partners, LLC. The notice of appeal in this case was filed on behalf of Prudential and Four Partners, LLC d/b/a Prizm Partners and d/b/a United Commercial Property Services.

2. We will refer to this entity as "Prizm."

Plano. The Secchis also were operating this restaurant profitably at the time of the trial.

The Secchis wanted to expand their restaurant business. In late 1999 and early 2000, with the help of their real estate broker, the Secchis began to look for additional restaurant property. As the Secchis had done when they opened or relocated their other restaurants, they performed demographic studies of various locations, studied restaurant reports prepared by the Texas Alcoholic Beverage Commission, and drove by or visited many sites in connection with their search for a location for their new restaurant. Hudson's Grill was a restaurant located in a building at Keystone Park Shopping Center. Keystone Park, as well as the Hudson's Grill building, was owned by Prudential. The Secchis' broker told them that Hudson's Grill was probably going to close and that the restaurant site might be coming up for lease. The Secchis were familiar with the shopping center and had driven by it before. As a part of their continuing feasibility study, they often ate at other restaurants located in Keystone Park. These restaurants included Razzoo's, Bone Daddy's, and El Chico's. Using various means at their disposal, the Secchis discovered that the other restaurants in Keystone Park were operating profitably.

Prizm was a property manager for Prudential. In February 2000, the Secchis met with Frances Fox Powell, Director of Property Management for Prizm, and discussed the Hudson's Grill building. In May 2000, the Secchis executed a letter of intent to lease the property. The parties began to negotiate the terms of the lease and of a personal guaranty to be signed by the Secchis. The Secchis' broker and attorney assisted them in negotiating the final lease terms. At least seven different drafts of the lease were circulated during this period of time. Also, during this period of time, the Secchis visited the site that is the subject of this lawsuit on several occasions. At times, the Secchis met with Prizm's agents at the property, and at other times, they would get a key from Prizm and go to the property without anyone from Prizm being present. Hudson's Grill had closed by this time, and no restaurant operations were being conducted on the premises.

Negotiations continued for about five months. The parties signed the lease in October 2000. The lease was executed by Francesco Secchi as manager of Secchi, LLC, the General Partner of ICP. The Secchis executed a personal guaranty of the lease.

After the parties executed the lease, ICP began remodeling the property. In December 2000, while ICP was remodeling the building, several different persons told Francesco Secchi that there had been a sewer gas odor problem in the restaurant when it was operated by Hudson's Grill. Francesco Secchi also personally noticed the odor. He told Powell about the problem but continued to remodel.

Italian Cowboy actually opened on March 1, 2001 (the "soft opening"), but the grand opening was not until April 9, 2001. After Italian Cowboy was operational and opened for business, the sewer gas odor problem continued.

Although Prudential attempted to solve the problem, the transient sewer gas odor remained the same.[3] Italian Cowboy re-

---

3. Although Prudential attempted to solve the sewer gas problem, it and Prizm maintain that those repairs were the responsibility of ICP under the terms of their lease. The next tenant of the premises, Michael David Leatherwood, associated with Razzoo's and Bone

mained open, and ICP paid rent on the premises in March, April, May, and June 2001. ICP did not pay rent for July 2001 or for any month after that. Italian Cowboy closed on July 14, 2001. This lawsuit was filed two days earlier on July 12, 2001.

After a bench trial, the trial court made detailed findings of fact and conclusions of law. We have not been cited to any standards of review, but they are well known. Findings of fact entered after a bench trial have the same force and effect as jury answers. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). We conduct a review of those findings for factual sufficiency under the same standards that we apply when reviewing jury answers. While a court of appeals cannot make original findings of fact, it can "unfind" facts. *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986). Although conclusions of law may not be reviewed for factual sufficiency, a court of appeals may review them to determine their correctness under the facts. *Keisling v. Landrum*, 218 S.W.3d 737, 741 (Tex.App.–Fort Worth 2007, pet. denied). We review conclusions of law de novo. *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46 (Tex.2007); *Bastian Material Handling, L.L.C. v. Stelluti Kerr, L.L.C.*, 229 S.W.3d 407, 409 (Tex.App.–Eastland 2007, no pet.).

### *Fraud and Negligent Representation Claims*

■ We will first address issues surrounding the common-law fraud claim, the statutory fraud claim, and the negligent misrepresentation claim made against Prudential and Prizm. Common-law fraud may be proven by a showing that there has been a material representation, that the representation was false, that it was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth, that it was intended to be acted upon, that it was relied upon, and that it caused injury. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

TEX. BUS. & COM.CODE ANN. § 27.01(a)(1) (Vernon 2002) is the basis for the statutory fraud claim. Section 27.01(a)(1) provides, in parts relevant to this section of our opinion, as follows:

> (a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
>
> (1) false representation of a past or existing material fact, when the false representation is
>
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
>
> (B) relied on by that person in entering into that contract[.]

■ A cause of action for negligent misrepresentation requires proof that there has been a representation by a person in the course of business or in a transaction in which he has a pecuniary interest, that false information is supplied to another for the guidance of that other person in their business, that the one making the misrepresentation did not exercise reasonable care or competence in obtaining the information or communicating the information, and that there has been a pecuniary loss suffered by one *justifiably relying* on the misrepresentation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991); *Trans–Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 696 (Tex.App.–Eastland 2002, no pet.).

Daddy's, opened a restaurant called "Skoot's." He remedied the sewer gas problem by extending the height of the sewer vent pipes on the roof and by rerouting a sewer gas line going to the roof.

The trial court found that Powell, the director of property for Prizm, made the following statements to the Secchis during lease negotiations:

a. The Secchis were lucky to be able to lease the Premises because the building on the Premises was practically new and was problem-free;

b. No problems had been experienced with the Premises by the prior tenant;

c. The building on the Premises was a perfect restaurant site and that the Secchis could get into the building as a restaurant site for next to nothing;

d. Given Fran Powell's superior and special knowledge, these matters were represented by PRIZM and Prudential as facts, not opinions. Fran Powell did not think the building was perfect at the time she told the Secchis it was.

The trial court also found that the statements were false; that Powell and therefore Prizm and Prudential knew that they were false; and that they intended for the Secchis and ICP to rely upon them. Further, the trial court found that the Secchis and ICP relied on the statements and would not have entered the lease and executed the guaranty if the representations had not been made. For purposes of this section of this opinion, we take those findings as true. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178, 181 (Tex.1997).

Prudential and Prizm argue that common-law fraud, statutory fraud, and negligent misrepresentation all have the common element of reliance and that ICP disclaimed any reliance on representations not contained in the lease. They maintain that the disclaimer conclusively negates reliance and, therefore, that ICP and the Secchis cannot recover under any of these three theories.

The lease between Prudential and ICP contained, in relevant part, the following provisions:

14.18 *Representations.* Tenant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein.

14.21 *Entire Agreement.* This Lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and no subsequent amendment or agreement shall be binding upon either party unless it is signed by each party.

When fraudulent or negligent misrepresentations have been made before a contract is executed, may a party successfully prosecute fraud claims and negligent misrepresentation claims when the contract contains provisions by which it is agreed that there are no representations outside of the contract and that the writing constitutes the entire agreement of the parties? We believe that the answer to that question depends upon the circumstances surrounding the particular transaction.

In *Schlumberger*, 959 S.W.2d 171, the court discussed the history of Texas cases in which disclaimer of reliance and merger clauses were addressed. The court made the observation that the early decisions on the subject were "not entirely consistent." *Schlumberger*, 959 S.W.2d at 178. Because the supreme court has already reviewed those early cases, we see no need to repeat that review here. Instead, we will begin with a review of *Schlumberger*.

In *Schlumberger*, the parties became involved in a dispute over their business arrangement involving diamond mining operations on the ocean floor off the coast of South Africa. They reached an agreement by which they resolved their dispute, and

they executed a release in accordance with that agreement. The release contained a disclaimer of reliance. Later, claiming that Schlumberger had misrepresented the viability and value of the project, the Swansons filed suit claiming that, as a result of the misrepresentations, they had been fraudulently induced to enter into the release. The jury found for the Swansons on all issues. The trial court rendered a judgment notwithstanding the verdict. That judgment was reversed by the court of appeals, and judgment was rendered in accordance with the jury verdict. We think that it is of special note that, in reversing the court of appeals, the supreme court specifically stated that it was required to assume that Schlumberger made the representations and that they constituted actionable fraudulent inducement. *Schlumberger*, 959 S.W.2d at 178, 181.

The *Schlumberger* court referred to its decision in *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957), and noted the rule from that case that, as a matter of policy, the effect of a merger clause can be avoided based on fraud in the inducement. Against that matter of public policy, however, the *Schlumberger* court recognized "a competing concern—the ability of parties to fully and finally resolve disputes between them." *Schlumberger*, 959 S.W.2d at 179. This court has held that the court's reasoning is not limited to those situations involving releases. *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711 (Tex.App.– Eastland 2007, pet. denied). By providing for valid disclaimers of reliance and merger clauses, parties can rely on the validity of these provisions to settle current disputes as well as avoid future ones. Acknowledging that such clauses can be effectual even in the face of fraud in the inducement, the court said in *Schlumberger*, "The question is under which circumstances such disclaimers are binding." 959 S.W.2d at 179.

■ Well-established rules of contract construction govern whether disclaimer and merger clauses are valid. *Id.* We look to the lease and the circumstances surrounding its formation to determine whether, in Paragraphs 14.18 and 14.21 of the lease, ICP gave the requisite clear and unequivocal expression of intent necessary to disclaim reliance on any misrepresentations of Prudential and Prizm. *Id.*

In *Schlumberger*, the court found these factors to be important to its decision that the fraudulent inducement claim was foreclosed: (1) the parties were attempting to end a situation in which they had become embroiled in a dispute over the value and feasibility of the subject project, (2) highly competent and able legal counsel were involved in negotiating the release, (3) the parties were negotiating at arm's length, and (4) the parties were knowledgeable and sophisticated in business. *Schlumberger*, 959 S.W.2d at 180.

Here, Prudential, Prizm, and the Secchis had been negotiating the lease for approximately five months. During this five-month period of time, the Secchis had visited the property many times, both with and without Prizm personnel being present.

The Secchis were successful restauranteurs. They were operating two other restaurants profitably at the time of the negotiations for the Keystone Park location. They had negotiated three separate leases on three separate locations for Ferrari's and one lease for Il Grano. Before they engaged in any business or leased any property, including this one, the Secchis performed detailed demographic studies, ate at different restaurants in the areas, studied restaurant reports from the Texas Alcoholic Beverage Commission, studied fi-

nancial figures from other restaurants in the areas, as well as other studies. They also performed detailed projections of income so that they could measure "how the business [was] going to go" for the benefit of themselves as well as any investors or any lenders. On all of these other occasions, the Secchis had partners who were attorneys, and they were represented by counsel in all of the transactions. In the negotiations for this lease and guaranty, they were represented by counsel as well as by their real estate broker. There were at least seven drafts containing negotiated revisions of the lease that were circulated over five months during the negotiations. Although Francesco Secchi testified that he never read these drafts, Jane Secchi said that she read the leases and discussed them with their attorney.

■ Not every disclaimer of reliance or merger clause will bar a fraudulent inducement claim. *Schlumberger*, 959 S.W.2d at 181. However, when we review this record and consider the circumstances surrounding the formation of the lease, we find that the parties were represented by counsel as well as real estate brokers both before and during the negotiations leading up to the signing of the lease and guaranty. The record also reveals that the parties to this arm's length transaction were sophisticated in dealings involving the leasing and the operation of restaurant properties, that several drafts of the lease were circulated, and that various changes were negotiated and made to both the lease and the guaranty.

■ We assume parties to a contract intend that every provision in it is to have some meaning. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996). When sophisticated business parties who have fully negotiated a contract and who have been represented by attorneys or other professionals in the field are dealing at arm's length, they should be able to enter a contract in which they effectively disclaim reliance, or in which they agree that there are no representations outside of the written contract, or in which they .otherwise provide for merger. Such a rule will result in agreements with predictable results and liability limitations that are well-defined.[4] Fur-

---

4. See generally, Glenn D. West, letter to the Clerk of the Supreme Court of Texas, dated September 8, 2006, and accompanying attachments filed as amicus curiae in support of the petition for review in *Celotex Corporation v. Warehouse Assocs. Corporate Centre II, Inc.*, No. 06–0384, now pending in the Supreme Court of Texas: Glenn D. West & Benton B. Bodamer, *Corporations*, 59 SMU L. Rev. 1143 (2006), and Glenn D. West & Benton B. Bodamer, Avoiding Fraud and Other Extra–Contractual Claims: There May Be More to the Deal than the Contract (presented to the Mergers and Acquisitions Institute, September 7–8, 2006, Dallas, Texas). West and Bodamer take the position that sophisticated parties to a contract should be able to enter into an agreement by which they might "predictably define their rights, liabilities, and obligations by contract rather than open themselves up to a less clear and less defined body of tort law to which their bargain was deliber-

ately not made subject." West & Bodamer, *Corporations*, 59 SMU L. Rev. at 1164.

In *Warehouse Assocs. Corp. Ctr. II, Inc. v. Celotex Corp.*, 192 S.W.3d 225 (Tex.App.–Houston [14th Dist.] 2006, pets. filed), the purchaser of commercial property sued the seller alleging fraudulent inducement. The buyer had agreed that it was not relying upon any representations made by the seller (there were other agreements pertinent to the question of reliance that do not exist in the case before us). In its lawsuit, Warehouse Associates claimed that Celotex and its employees fraudulently induced Warehouse Associates into buying the property by not disclosing the fact that there was asbestos on the premises. The trial court granted summary judgment to Celotex on all claims. The court of appeals reversed and remanded the case to the trial court. The essence of the holding, among other things, is that the parties to a contract cannot make an agreement that forecloses

ther, we believe that in this negotiated, redrafted lease agreement the ·disclaimer and merger clauses must be considered to be a part of that negotiated agreement and not simply boilerplate as found by the trial court. Under such circumstances, sophisticated parties who are represented by counsel and other professionals certainly can bargain to have the details of any representations upon which they are relying inserted into the contract, rather than agreeing that there are none.

After examining the circumstances surrounding the formation of the lease under this record, we hold that the sophisticated business parties in this arm's length transaction clearly and unequivocally expressed their intent that they were not relying on any representations made outside of the agreement. The agreement that there were no representations outside of the contract and that the lease constituted the entire agreement between Prudential and ICP conclusively negates the element of reliance in the common-law fraud claim, the statutory fraud claim, and the negligent misrepresentation claim. Here, there can be no recovery on those claims, and for the reasons we have stated, Prudential and Prizm's issues on appeal relative to those claims are sustained.

### Breach of the Implied Warranty of Suitability

Because the trial court also found in favor of ICP and the Secchis on their claim for breach of the implied warranty of suitability, we next address that issue.

■ In *Davidow v. Inwood North Professional Group–Phase I,* 747 S.W.2d 373, 377 (Tex.1988), the court held that, in a commercial lease, the lessor makes an im-

plied warranty that the premises are suitable for the intended commercial purpose. It said that what that meant was (1) at the inception of the lease, (2) there were no latent defects in the facilities (3) that were vital to the use of the premises (4) for their intended commercial purpose and (5) these essential facilities would remain in a suitable condition. 747 S.W.2d at 377. It seems to be clear that using the clause, "these essential facilities will *remain* in a suitable condition," presupposes that the lessor had a continuing duty to repair such "essential facilities" that contained the latent defects (emphasis added). That is underscored by the court's statement that, if "the parties to a lease expressly agree that the tenant will repair *certain* defects, then the provisions of the lease will control" (emphasis added). *Id.* Therefore, the indication was that the implied warranty of suitability for commercial purposes could be altered or waived.

In *Gym–N–I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 910 (Tex.2007), the court acknowledged that it did not decide in *Davidow* the manner in which that waiver might occur. In *Snider,* the parties expressly agreed that the landlord made no express or implied warranties regarding "fitness or suitability for a particular purpose or otherwise." *Id.* at 907 n. 1. They also expressly agreed that "any implied warranties are expressly disclaimed and excluded." *Id.* The lease also contained a provision that the tenant accepts the premises "as is." While specifically not deciding what the effect of the "as is" provision would have been absent the express waiver contained in the lease, the court did hold that the implied warranty of suitability in a commercial lease could be

them from later asserting that the contract was induced by fraud, except in those situations in which the parties are settling an

existing dispute. *Warehouse Assocs.,* 192 S.W.3d 225.

expressly disclaimed. *Snider*, 220 S.W.3d at 912.

■ As a contrast to the implied warranty of suitability in the commercial lease context, the court in *Snider* cited *Centex Homes v. Buecher*, 95 S.W.3d 266, 274 (Tex.2002). *Centex* involved the implied warranty of habitability in a residential transaction. That case stands for the proposition that "the warranty of habitability can be waived only to the extent that defects are adequately disclosed." *Centex*, 95 S.W.3d at 274. It would seem, then, that, in a residential transaction, the warranty of habitability cannot be waived as to latent defects. If disclosed, defects are not latent. We write about this because, in *Snider*, the court said: "We recognize that our holding today stands in contrast to the implied warranty of habitability, which 'can be waived only to the extent that defects are adequately disclosed.'" *Snider*, 220 S.W.3d at 913 (citing *Centex*, 95 S.W.3d at 274). We take that to mean that, in the commercial lease context, an express waiver of the implied warranty of suitability can be effective even in the absence of disclosure.

Here, there is no express waiver of the implied warranty of suitability. Rather, the parties rely upon the placement of repair responsibilities in support of their respective positions.

ICP argues, and the trial court so found, that Paragraph 5.1 of the lease expanded Prudential's repair obligations. However, Paragraph 5.1 of the lease addresses the requirement that, before ICP could make any exterior or structural alterations, it must first obtain Prudential's approval. As a matter of law, this paragraph does not place any repair responsibilities on either party; it requires Prudential's approval before ICP makes any exterior or structural alterations.

In Paragraph 5.2 of the lease, the parties agreed that Prudential would make all repairs to the "Common Areas" adjacent to the premises "(other than the Premises and its perimeter sidewalks)." Prudential was also responsible for making "repairs to structural components of the Premises (other than the roof)."

The parties defined "Common Areas" as follows in Paragraph 1.1 of the lease:

Those areas, facilities, utilities, improvements, equipment and installations in the Shopping Center which are provided, or which may be designated by Landlord, for the nonexclusive use or benefit of Landlord and tenants of the "Shopping Center," their employees, agents, customers, licensees and invitees, including but not limited to the parking areas, driveways, entrance/exitways, sidewalks, landscaped areas, water, gas (if available), electric, storm and sanitary sewer lines and appurtenant equipment.

The parties also agreed in Paragraph 5.2 of the lease that ICP had the responsibility to make:

[A]ll repairs to the interior and non-structural components of the Premises, including but not limited to the exterior and interior of the Premises and its perimeter sidewalks, whether structural or non-structural, foreseen or unforeseen, including but not limited to the storefront and all interior and exterior doors and plateglass, and all electrical, plumbing, heating, ventilating, air conditioning, sprinkler systems, and any other mechanical installations or equipment serving the Premises or located therein, whether or not in or under the floor slab or on the roof of the premises.

Prudential and Prizm argue that the cause of the sewer odor problem was related to plumbing, ventilating, air conditioning, or some other mechanical installation.

They take the position that, because the lease placed the burden to repair those things upon ICP, those provisions control over the implied warranty of suitability. In their arguments, ICP and the Secchis contend that Prudential and Prizm ignore findings of fact regarding problems with a grease trap that contributed to the sewer gas odor problem. They also argue that, because the grease trap was located in the "Common Area," Prudential was obligated to repair it.

■ First, in regard to findings of fact, when a contract is not ambiguous, the construction of the written instrument is a question of law for the court. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). We review the trial court's legal conclusions de novo. *See Barber v. Colo. Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex.1995).

Prudential argues that, in accordance with the terms of the lease, ICP was required to make all repairs *"foreseen or unforeseen"* to the plumbing, ventilating, air conditioning, and *"any other mechanical installations or equipment serving the Premises or located therein"* (emphasis added). It is the position of Prudential and Prizm that this specific provision of the lease controls over the implied warranty of suitability. We agree. The phrase "foreseen or unforeseen" clearly includes latent defects that might exist at the inception of the lease. Any other reading would render the phrase meaningless. Generally, the parties to an instrument intend every provision to have some effect. *Lenape*, 925 S.W.2d at 574.

Again, in *Davidow*, when the court defined the warranty of suitability, it included this clause: "[A]nd that these essential facilities will remain in a suitable condition." *Davidow*, 747 S.W.2d at 377. We believe that the addition of that clause by the court makes it clear that the warranty

exists only as to those conditions for which the landlord bears the responsibility of repair. In *Coleman v. Rotana, Inc.*, 778 S.W.2d 867 (Tex.App.–Dallas 1989, writ denied), the court held that the warranty of suitability applied only with respect to those physical or structural defects that the landlord had the duty to repair. We agree with the Dallas Court and with the position asserted by Prudential and Prizm.

■ We hold as a matter of law that the lease placed the burden upon ICP to make any needed repairs, foreseen or unforeseen, to plumbing, heating, ventilating, air conditioning, and mechanical installations or equipment serving the premises. As pointed out in the brief filed by ICP and the Secchis, Skoot's, the tenant that leased the premises after ICP left, made repairs that eliminated the odor problem. Although ICP and the Secchis argue that the owner of Skoot's "totally altered the plumbing," the record shows that there was one sewer gas line that was "hooked up at the wrong line going up to the roof." That was corrected, and the vent pipes on the roof were raised; the problem was eliminated. Although the owner of Skoot's did not make any repairs to the grease trap when it eliminated the sewer gas odor, there was testimony regarding an earlier inspection in which it was discovered that a grease trap had been incorrectly installed and that that contributed to the odor. ICP and the Secchis argue that this grease trap was located in the "Common Area" and, therefore, that it was Prudential's responsibility to repair the problem. The trial court also found that the grease trap was located in the "Common Area." However, if we take it to be true that the grease trap did contribute to the problem and that it was located in the common area, the implied warranty of suitability would not be implicated. The implied warranty of suitability covers only the leased

premises. *See Davidow,* 747 S.W.2d at 377; *see also Coleman,* 778 S.W.2d at 871. Because the lease placed the burden of these repairs upon ICP, those lease terms control over the implied warranty of suitability. We sustain Issue B(1) and B(2).

### Constructive Eviction and Covenant of Quiet Enjoyment

The trial court also granted relief to ICP upon the causes of action for constructive eviction and for breach of the covenant of quiet enjoyment. The parties agree that both of these causes of action require the same proof. The elements for both causes of action are: (1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises, (2) a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises, (3) an act that permanently deprives the tenant of the use and enjoyment of the premises, and (4) abandonment of the premises by the tenant within a reasonable time after the commission of the act. *Lazell v. Stone,* 123 S.W.3d 6, 11–12 (Tex.App.–Houston [1st Dist.] 2003, pet. denied); *Holmes v. P.K. Pipe & Tubing, Inc.,* 856 S.W.2d 530, 539 (Tex.App.–Houston [1st Dist.] 1993, no writ).

Prudential and Prizm maintain that there is no evidence of any intent that ICP would no longer enjoy the premises. They also argue, in effect, that there is no evidence that they engaged in any conduct, affirmative or otherwise, that substantially interfered with ICP's intended use and enjoyment of the premises. According to Prudential and Prizm, to show their lack of intent, they undertook to assist with the repairs at a time that they maintain they were not required to do so. ICP and the Secchis counter that, by misrepresenting and omitting material facts, Prudential and Prizm breached the covenant of quiet enjoyment and constructively evicted ICP.

ICP and the Secchis rely upon *Holmes.* In *Holmes,* a certain tract of land had been used to dump chemical waste. The Texas Department of Water Resources mandated a clean-up and approved a waste disposal closure plan. Subsequently, Holmes, the owner of the property, leased it to Tenneco. Tenneco used the property to store pipe. Only a portion of the property had been used as a chemical waste dump. But, that was the part upon which the initial pipe inventory was stored. Tenneco later sold the pipe to P.K. Pipe & Tubing, Inc. P.K. Pipe contacted Holmes about entering into a lease so that they could continue to store the pipe they had bought from Tenneco as well as other pipe there. There was a dispute as to whether Holmes told P.K. Pipe about the dump.

Later, it was discovered that the storage of the pipe over the waste dump potentially could cause a problem with the reclamation and remediation work that had been done there. P.K. Pipe was required to move the pipe, and it sued Holmes for breach of the lease agreement, misrepresentation, and another cause of action not relevant here. The case ultimately turned upon the Houston Court's finding that P.K. Pipe did not abandon the premises within a reasonable time after the discovery of any misrepresentation and that, therefore, there was no breach of the covenant of quiet enjoyment. The court mentioned in its opinion that it "is clear that a material act by [Holmes] (his silence concerning the existence of the waste disposal site) deprived P.K. Pipe of use and enjoyment of a *portion* of the premises." *Holmes,* 856 S.W.2d at 539.

Prudential and Prizm take the position that the latter comment by the court in Holmes is dicta and further that precontractual behavior cannot be the basis for

establishing post-contractual intent. We agree with Prudential and Prizm that pre-contractual behavior cannot be the basis for establishing post-contractual intent. To hold otherwise would be to allow for constructive eviction or the breach of the covenant of quiet enjoyment before a tenant came into possession of the property under a lease. We have not been able to find other cases in which the court holds that acts occurring prior to the lease agreement constitute constructive eviction or a breach of the covenant of quiet enjoyment.

The cases to which we have been cited and those that we have been able to find involve acts of commission or omission occurring during the lease or rental period. *See, e.g., Lazell,* 123 S.W.3d 6 (The landlord changed the locks on the property during the term of the lease and instructed the tenant that she was no longer welcome on the property.); *Fid. Mut. Life Ins. Co. v. Robert P. Kaminsky, M.D. P.A,* 768 S.W.2d 818 (Tex.App.–Houston [14th Dist.] 1989, no writ) (A part of Dr. Kaminsky's practice involved performing elective abortions. Protestors were causing problems at his clinic located at the leased premises. In the lease agreement, the landlord agreed that it would provide certain security and other things that it did not do. The lease also had an express covenant of quiet enjoyment.); *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.,* 748 S.W.2d 309 (Tex.App.–Houston [14th Dist] 1988, no writ) (The air conditioning system at the leased premises failed during the lease term. The landlord failed to make air conditioning repairs during the lease term that it was required to make under the terms of the lease.).

Even if we assume that Powell did knowingly make false statements, she did not make those statements during the lease term, and any such statements could not form the basis for constructive eviction or for a breach of the covenant of quiet enjoyment as a matter of law. Prudential and Prizm's Issue B(3) is sustained.

### Mutual or Unilateral Mistake

In order to avoid an agreement based upon mutual mistake, a party must show that there has been a mistake of fact, that the mistake is mutual, and that the mutual mistake materially affects the agreed-upon exchange. *Barker v. Roelke,* 105 S.W.3d 75, 84 (Tex.App.–Eastland 2003, pet. denied). When there is a unilateral mistake of fact, courts will grant relief when the conditions of remedial mistake are present. *James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.,* 160 Tex. 617, 335 S.W.2d 371, 373 (1960). Although there may be others, some of the conditions of remedial mistake as set forth by the *Taylor* court are:

(1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and, (4) the parties can be placed in status quo in the equity sense, i.e., rescission must not result in prejudice to the other party except for the loss of his bargain.

*Id.*

In their initial briefing, Prudential and Prizm direct their arguments to a claim that ICP ratified the lease after discovering the sewer gas odor problem. In their reply brief, they attempt to expand their argument to include attacks on one element of proof related to mutual mistake: that the mistake materially affects the agreed-upon exchange (*see Barker,* 105 S.W.3d at 84) and one element of proof related to unilateral mistake (that the mistake is of such a great consequence that to

enforce the contract as made would be unreasonable) (*see James T. Taylor*, 335 S.W.2d at 373). Prudential and Prizm do not, either in their original brief or in their reply brief, attack any of the other elements related to either mutual mistake or unilateral mistake. Because it was the only issue raised in the initial briefing, we will consider only the ratification argument. *See Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex.App.–Austin 2004, pet. denied). Further, even if we were to address mutual mistake and unilateral mistake, none of the remaining elements of either are challenged. Insofar as Prudential and Prizm may have addressed mutual mistake and unilateral mistake, those challenges are overruled, and we will proceed to review their claim of ratification.

### Ratification

■■■■ This court has held that a party ratifies an agreement when it recognizes the validity of the agreement by acting under it, performing under it, or affirmatively acknowledging it. *Barker*, 105 S.W.3d at 84. Ratification may be express or it may be implied from a course of conduct. *Id.* After a party has ratified an agreement, it may not withdraw the ratification and attempt to avoid the agreement. *Id.* Acts that are inconsistent with an intent to avoid the agreement have the effect of ratifying it. *Id.* at 85. A person ratifies an agreement as a matter of law if the evidence is not controverted or is incontrovertible. *Id.*

Prudential and Prizm argue in their original briefing that "the evidence conclusively establishes the [ICP and the Secchis] ratified the Lease and the Guaranty after learning about the odor." We agree. Assuming for the purposes of this section of our opinion the Secchis' testimony to be accurate, we acknowledge that, each time

Francesco Secchi noticed the sewer gas odor, he contacted Powell and told her about the problem. One day before the opening of Italian Cowboy, Francesco Secchi noticed the sewer gas odor and again called Powell. The "soft opening" of Italian Cowboy was on March 1, 2001. On March 5, 2001, an inspector from the City of Dallas Department of Environmental Health Services came to Italian Cowboy in response to a sewer odor complaint made by one of Italian Cowboy's customers. The inspector issued a notice of violation. Italian Cowboy had to close from 1:15 p.m. to 5:00 p.m. that day. Francesco Secchi again called Powell to report the continuing problem. According to Francesco Secchi, Powell's response to him was that she could not understand why he complained all of the time. He contacted her because he was operating under the assumption that Prudential was responsible for taking care of the cause of the odor problem. The trial court found that ICP's interpretation of the lease was that these repairs were Prudential's responsibility.

In June 2001, the Secchis met Darla Wahl. Darla and her husband came to Italian Cowboy as customers. Darla worked for Hudson's Grill from February 1999 until it closed in February 2000. She told the Secchis that the same odor was in the building when she worked for Hudson's Grill. She also told them about customers of Hudson's Grill complaining about the odor. Francesco Secchi testified that, after he had talked with Wahl, he "realized that the landlord was not honest with us and we lost already half a million dollars and that's our decision not to lose any more money."

Whether mutual or unilateral, the mistake of fact relied upon by ICP and the Secchis was the fact of the presence of the sewer gas odor. From the time that the Secchis noticed the sewer gas prob-

lem, they consistently reported the problem to Prizm. Prudential attempted, at its expense, to resolve the odor problem. This would have been in accordance with Francesco Secchi's understanding of Prudential's obligations under the lease.

We hold as a matter of law that, by continuing to insist upon Prudential's performance under the lease, ICP and the Secchis' conduct in insisting that Prudential perform under the lease according to their understanding of the lease (that the sewer gas odor problem was Prudential's task to repair) constitutes conduct that is inconsistent with an intention of avoiding the lease. By insisting that Prudential perform on its perceived obligations under the lease, ICP indicated that it was relying on the validity of the lease, and such conduct had the effect of waiving the right of rescission. This is consistent with ICP and the Secchis leaving the premises only after receiving a letter from Powell, dated June 22, 2001, in which she notified ICP that, in essence, Prudential was not going to continue to attempt to solve the sewer gas problem unless certain conditions were met. Prudential would pay for certain currently recommended repairs only if the contractor would guarantee that the repairs would solve the sewer gas odor problem and if ICP would agree to assume all future repairs needed to solve any unresolved problems with sewer odors. There were other conditions that are not relevant here. ICP and the Secchis did not agree to the conditions. When ICP and the Secchis learned that Prudential was no longer going to abide by what the Secchis believed Prudential's responsibilities to be, they filed this lawsuit on July 12, 2001, and the restaurant closed on July 14, 2001.

■ A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Ma-*

*rine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982). The trial court found that ICP had made that interpretation of the lease provisions regarding repairs. One can only conclude that ICP was expecting Prudential to perform under its interpretation of the contract. The evidence we have set forth conclusively establishes that ICP ratified the lease by taking actions that were inconsistent with an intent to avoid it.

### Damages Issues

Because we have held that ICP and the Secchis are not entitled to recover on any of the causes of actions alleged, we need not reach the arguments addressing damages.

### Exemplary Damages

The trial court awarded ICP judgment for exemplary damages in the sum of $50,000 against Prizm. From a reading of the briefs of the parties, it is clear that the award of exemplary damages related to the statutory fraud claim. Because we have held that the statutory fraud claim (as well as the other tort claims) is not viable, we reverse the award of exemplary damages against Prizm. Issue D(2) is sustained.

### Attorney's Fees

Because we are remanding a part of this cause and because ICP and the Secchis are no longer the prevailing parties, we set aside the award of attorney's fees to ICP and the Secchis.

### Prudential's Counterclaims

■ The trial court concluded that Prudential and Prizm were to take nothing from ICP and the Secchis. Therefore, there were no findings of fact regarding the amount of Prudential's damages. As we have stated, this court cannot find

facts; we can only "unfind" them. *Tex. Nat'l Bank*, 717 S.W.2d at 903. Because we have found that ICP could not avoid the lease on any of the theories alleged and because ICP quit paying rent to Prudential, ICP breached its lease with Prudential. Prudential is entitled to recover for that breach in an amount to be determined by the trial court on remand. Issue C(1) is sustained. For the same reasons, Prudential is entitled to recover on the Secchis' guaranty those sums as found by the trial court on remand. Issue C(2) is sustained. Furthermore, neither can we find facts with respect to Prudential and Prizm's request for attorney's fees. Any amounts awarded to Prudential and Prizm must be determined by the trial court. We reverse and remand Prudential's damage claim and Prudential and Prizm's claim for attorney's fees to the trial court.

### *This Court's Ruling*

We reverse the judgment of the trial court and render judgment that ICP and the Secchis take nothing in their suit against Prudential and Prizm. We render judgment that ICP breached its lease agreement with Prudential and that the Secchis are liable upon their guaranty. We remand the issues regarding the amount of damages due Prudential and the amount of any attorney's fees to be awarded to Prudential and Prizm.